[Crim. No. 22153. Second Dist., Div. Three. Feb. 20, 1973.]

THE PEOPLE, Plaintiff and Appellant, v.
MANUEL SUVIA MUNOZ, Defendant and Respondent.

## COUNSEL

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Kent L. Richland, Deputy Attorneys General, for Plaintiff and Appellant.

Richard A. Walton for Defendant and Respondent.

## OPINION

**THE COURT.**—In a trial by jury defendant Munoz was found guilty of three offenses: (1) possession for sale of heroin in violation of section 11500.5 of the Health and Safety Code (count I), (2) possession for sale of seconal in violation of section 11911 of the Health and Safety Code (count II), and (3) possession for sale of an amphetamine in violation of section 11911 of the Health and Safety Code (count III).[1] On October 19, 1971, his motion for a new trial was denied but the trial court reduced each offense to that of a lesser included offense, namely, the conviction as to count I to a violation of section 11500 of the Health and Safety Code, and the convictions as to counts II and III to violations of section 11910 of the Health and Safety Code. Criminal proceedings were adjourned and defendant was referred to department 95, pursuant to the provisions of section 3051 of the Welfare and Institutions Code. On November 4, 1971, he was committed to the California Rehabilitation Center.

By a letter dated March 7, 1972, the California Rehabilitation Center informed the court that defendant was not suitable for the Civil Addict Program because of "excessive trafficking and failure to respond to previous programs."[2] After a number of continuances the matter of the propriety of the exclusion of defendant from the program was heard on June

---

[1] The superior court file in the criminal case (superior court No. A 113109) has been transmitted to this court at its request. (Rule 12(a). Cal. Rules of Court.)

[2] The body of that letter was as follows:

"The case of Manuel Suvia Munoz has been reviewed for suitability for the Civil Addict Program. It is our evaluation that he is not suitable because of excessive trafficking and failure to respond to previous programs. The attached document is a summary of the pertinent history in this case.

"Manuel Suvia Munoz was received by the Civil Addict Program on November 11, 1971, under Welfare and Institutions Code Section 3051. His commitment supervened his convictions of Possession of Dangerous Drugs, two counts, and Possession

2, 1972. The court determined that the director had abused his discretion in excluding the defendant from the program and ordered that defendant be redelivered to the California Rehabilitation Center for execution of the prior commitment. The People have appealed from the order of June 2, 1972, as an order made after judgment affecting substantial rights of the People.

The opening brief of the People was filed on September 5, 1972. In the superior court the defendant was represented by private counsel who remains his attorney on this appeal. (*People* v. *Bouchard,* 49 Cal.2d 438 [317 P.2d 971]; *People* v. *Landers,* 2 Cal.App.3d 239, 240 [82 Cal.Rptr. 401].) The People's brief was duly served on him. On October 17, 1972, the notice provided for by rule 17b of the California Rules of Court was mailed by the clerk of this court. No brief has been filed on behalf of defendant and respondent within the time permitted.

■ The initial question to be resolved is whether the People may

of Narcotics in Superior Court of Los Angeles County (Case Number A-113109) on September 7, 1971.

"The documents which were considered at the time of this evaluation were a probation officer's report dated September 28, 1971, the Cumulative Case Summary prepared by this facility and his previous institutional record. In addition, we requested an Initial Field Study to be done by the Parole and Community Services Division. This report was completed by James E. Connor, Parole Agent in the Burbank Unit.

"In these reports it indicates that Mr. Munoz was arrested along with two others and a large sum of narcotics were confiscated. The narcotics which were seized were 102 grams (3+ ounces), 611 amphetamines (approximately ½ pound), 2610 secobarbitals (approximately 1½ pounds) along with milk sugar, funnels and numerous packages of balloons. From all indications this was more than their daily needs would require. Also at the time of Subject's arrest he had on his person $1,000 in United States currency and a key to the apartment.

"In 1956 Subject was committed to state prison for Sales of Narcotics. He was paroled after three years in custody. In 1961 he was returned to prison as a parole violator. He was paroled in December 1963. On two occasions he was placed in the Narcotic Treatment Control Unit (NTCU) between 1965 and 1966. He was eventually discharged from supervision in August 1969.

"These reports indicate that Mr. Munoz has been involved in criminal and drug activities for a long period of time. He has had the opportunity to change his life style while under the Department of Corrections jurisdiction. His present offense and the amount of narcotics and dangerous drugs which were found would indicate that he was once again involved in the trafficking of drugs for profit.

"An evaluation of this material resulted in the determination that Mr. Munoz is an unsuitable subject for the Civil Addict Program and clearly falls within the exclusionary criteria of the Director of Corrections.

"In view of the foregoing, Mr. Munoz is referred to the Court pursuant to the provisions of Welfare and Institutions Code Section 3053 for such further proceedings on the suspended criminal charges as may be deemed warranted.

"Mr. Munoz will be retained at the California Rehabilitation Center pending Court action. It is respectfully requested that further correspondence and Court Orders be directed to the undersigned at this facility."

appeal from the order of June 2, 1972. A commitment of the nature of that of November 4, 1971, is deemed to be civil in nature (*People* v. *Jasso*, 2 Cal.App.3d 955, 964 [82 Cal.Rptr. 229]) and is appealable as a final judgment in a special proceeding. (*In re De La O*, 59 Cal.2d 128, 156 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705]; see also *People* v. *Winfrey*, 13 Cal.App.3d 818, 825, fn. 7 [92 Cal.Rptr. 33].) Accordingly, we deem the People's appeal from the order of June 2, 1972, to be proper as an appeal from an order made after a final judgment (order) in a special proceeding. (Code Civ. Proc., §§ 904, 904.1, subd. (b); see *People* v. *Jasso, supra*, at p. 963.)

Section 3053 of the Welfare and Institutions Code is as follows: "If at any time following receipt at the facility of a person committed pursuant to this article, the Director of Corrections concludes that the person, because of excessive criminality or for other relevant reason, is not a fit subject for confinement or treatment in such narcotic detention, treatment and rehabilitation facility, he shall return the person to the court in which the case originated for such further proceedings on the criminal charges as that court may deem warranted."

In *People* v. *Montgomery*, 255 Cal.App.2d 127, at page 131 [62 Cal. Rptr. 895], the court stated: "When the Director of Corrections rejects a person committed to the rehabilitation center under the authority conferred by Welfare and Institutions Code, section 3053, the trial court has authority to review his action for the purpose of determining whether or not the rejection constituted an abuse of discretion; upon request by the defendant must undertake such a review and conduct a hearing; in reviewing the decision may rely upon the record and information furnished by the director, as well as other pertinent evidence; and, in the event it determines there was an abuse of discretion, should require the director to reconsider his decision or should return the defendant to the rehabilitation center for execution of its original commitment order. [Citations.]"

██ The first question thus presented is whether "excessive trafficking and failure to respond to previous programs" constitute "other revelant reason [or reasons]" for a conclusion by the Director of Corrections that a person committed is not "a fit subject for confinement or treatment." (See *People* v. *Hakeem*, 268 Cal.App.2d 877, 881 [74 Cal.Rptr. 511].) At the hearing on June 2, 1972, Angela Idoux, a special representative for the civil addict program at the California Rehabilitation Center, testified that "excessive trafficking" had reference to the person's "sales of narcotics on a large scale over and above that needed to support his immediate needs." She further testified that the exclusion of defendant Munoz was not based

on "excessive criminality"; the guidelines take the position that the California Rehabilitation Center is interested in the person who is basically an addict and whose criminal involvement may be incidental to his addiction. Referring to the exclusionary criteria guidelines of the Department of Corrections as to "excessive trafficking," the witness testified that "it is stated that would appear to be involved in large sales, trafficking or person found to be trafficking or possession of narcotics beyond that which would be reasonably necessary to support their own need." Part of the witness' testimony as to the written guidelines was as follows: "Q. Subdivision C, Trafficking in Narcotics Minimal. Meaning you want just the small sellers, not the large sellers, right? A. Right."

A further portion of the testimony of Miss Idoux was: "Q. Now, what is relevant—let's assume something. Let's assume excessive trafficking has some significance here. What is relevant about that in determining whether or not a particular person is suitable for treatment and confinement at C.R.C.? A. Well, the relevancy comes into play because of the treatment and the cooperation on out patient status which is necessary because of supervision. He failed on, you know, parole in these instances, and going back with a new charge on one—getting reinvolved in another crime on one case, absconding [sic] from parole supervision during the period of time and being determined parolee at large for this period, and in order to— C.R.C. feels that people who are going there, hopefully, are attempting to benefit by it and will therefore cooperate in some area with the—either internal aspects of the program or those in the field, and cooperating is, you know, not getting involved in new crimes, not absconding [sic] from parole supervision, because they can't be treated if they do these kinds of things."

That, aside from being addicted to the use of narcotics, a person has engaged in extensive trafficking in narcotics is manifestly a relevant reason for exclusion from the rehabilitation program. As in the case of "excessive criminality" (see *People* v. *Fuller,* 20 Cal.App.3d 159, 164 [97 Cal.Rptr. 455]), a person who has engaged in such "excessive trafficking" may be less amenable to treatment, control and cooperation, either on the in-patient or the out-patient level, and his very presence may involve danger to others in the program. With respect to the reason of "failure to respond to previous programs," it is obvious that that reason is relevant within the meaning of section 3053 of the Welfare and Institutions Code in that prior experience is a reasonable basis for a conclusion that exposure to further treatment will again result in failure.

■ However, while the reasons given by the superintendent for the

exclusion fall within the scope of relevancy set forth in section 3053, the question of whether there was a factual basis for the superintendent's determination that the defendant had engaged in excessive trafficking and had failed to respond to previous programs remains for consideration. (See *People* v. *Fuller, supra,* 20 Cal.App.3d 159, 165.) It is to be noted that in his letter of March 7, 1972, the superintendent relied upon the matter of the "large sum of narcotics . . . confiscated," together with narcotic paraphernalia, commenting that from "all indications this was more" than the daily needs of the three persons would require. Reference was also made to the fact that defendant Munoz then had on his person $1,000 in money and a key to the apartment involved. After referring to the defendant's commitment in 1956 to state prison for sale of narcotics and his subsequent parole difficulties, including the fact that on two occasions between 1965 and 1966 he was "placed in the Narcotic Treatment Control Unit (NTCU)," the superintendent stated: "His present offense and the amount of narcotics and dangerous drugs which were found would indicate that he was once again involved in the trafficking of drugs for profit."

Turning again to the hearing and considering testimony bearing upon the issue of abuse of discretion by the director,[3] it is to be noted that Miss Idoux, the representative of the superintendent's office of the rehabilitation center, was questioned as to the matter of defendant's failure to respond to previous programs, part of her testimony being as follows: "A. . . . The record indicates that he was sentenced to State Prison and spent three years on one occasion prior to parole; released to parole and returned for another period of two years. . . . The third time he was received—returned to the Narcotics Treatment Control Unit. Between that return and a fourth return to the institution he absconded from parole supervision for a period of — . . . from October of '65 to June of '66."

On cross-examination by defendant's attorney, Miss Idoux testified that in the cumulative case summary there was a statement by one counselor, contained in the initial study dated December 1, 1971, which was as follows: "His parole adjustment ranged from good to poor as he maintained work; but due to depression and job layoffs reverted to narcotic

[3]In *People* v. *Fuller, supra,* 20 Cal.App.3d 159, the court stated at page 165: "The determination of the trial court in committing defendant to the Director of Corrections is not binding on the director or his staff. Whether or not an individual can be treated with success in a rehabilitation program is a fact which must be determined, in the last analysis, 'not by judges but by people trained in that field and actually engaged in the treatment process. Hence, out of practical necessity. the statute leaves to the professional experts the final decision on whether or not treatment should be begun or continued.' [Citations.]"

use. We have requested an I.F.S. study [initial field study] to determine if his actual involvement in sales activities, but he is viewed as a good candidate for C.R.C. if the I.F.S. does not reflect profiteering activities." Miss Idoux further testified that in a document dated February 16, 1972, a counselor, Mr. Wainstock, recommended that defendant be retained in the program. Mr. Wainstock said that defendant did well on parole, while another counselor took the view that defendant did not benefit from his parole. It is true that the parole records disclose that defendant did well the last time he was on parole; he completed his parole without any violations or new arrests. In the I.F.S. (initial field study) it was shown that defendant had relatively few convictions. Defendant had not been on a California Rehabilitation Center program prior to the current commitment. Miss Idoux further testified: "A. . . . during the time of the narcotics treatment control, the program that he was returned to was a week of confinement of the California branch; however, not the California Rehabilitation's. Q. They had dry-outs for parolees; isn't that right? A. Yes. Q. The dry-out being a short-time confinement to allow the addict to rid his system at least of narcotic, right? A. Partially true. Q. And give him another start, clean, on the street, right? A. Partially, yes. Q. When you're talking about failure to respond to prior programs, you're talking about a failure to respond to some other program, not the C.R.C. program, aren't you? A. That is true."

On recross-examination Miss Idoux was questioned as to the field study prepared by a parole agent. It appeared that he reviewed defendant's arrest record and probation report. The witness assumed that the information obtained that defendant probably had a "$50-a-day" habit, and related information, resulted from interviewing police officers, narcotics officers, and possibly someone in the office of the district attorney. A further portion of the testimony of Miss Idoux was: "Q. And, then, it gets into some conversations with Victor Wanek of L.A.P.D. Narcotics and Detective Sherwood of San Fernando Narcotics Detail, right? A. Correct. Q. And as you review that initial field study, it appears that it is the information from Wanek and Sherwood that forms the basis for the determination that Munoz was a seller of a magnitude making him unsuitable for the program; is that right? A. I guess I would say that, yes."

The defendant testified on his own behalf at the hearing. He had been addicted for about 20 years. Charles Sherwood was the officer who arrested him for the 1956 narcotic sale. In 1969 he was arrested by Officers Sherwood and Wanek; they wanted to send him to C.R.C.; they instituted a civil proceeding and he went to department 95, but he was not committed.

On cross-examination defendant testified that when he was "under Mr. Wainstock at C.R.C. doing that dry-out with an 'A' number" in 1966, he participated in that program for 90 days. That was when he "grouped."

Upon the completion of the testimony at the hearing, the court made an oral statement consisting of a review of the pertinent facts. After referring to the transaction involved in the current criminal case, the court stated: "Now, other than this single transaction, it seems to me that the remaining basis for excessive trafficking is based entirely upon the statements made by the two officers which appeared to have been made on the basis of hearsay information furnished to them. When I committed this defendant to C.R.C. in the first instance, as I recall, it was because of the fact that he had only this one major conviction way back in 1956. He had been addicted ever since he was 16 years of age to the use of heroin and did not appear to have ever been exposed to any major type program in which he could be relieved of his addiction or assisted and that was one of the considerations."

The court further stated: "It seems to me that if a person who is addicted and who is engaged in selling for the purpose of securing money to support his habit even if he makes more money than he needs to support the daily amount necessary, the question still is whether he's motivated to do this for the purpose of accumulating money to insure that he will have a sufficient supply of his—there's nothing here to indicate that the defendant was doing more than that if he was. [¶] It is my view that the director abused his discretion in this case in excluding the defendant; . . ."

Factual matters upon which the defendant placed reliance at the hearing were of a nature akin to those before the court in *People* v. *Hakeem, supra,* 268 Cal.App.2d 877. With respect to the claim in *Hakeem* that the superintendent ignored statements by his staff which showed that defendant had responded favorably in the time he had been under observation at the institution, the court stated (p. 882): "But the decision to accept or reject is vested by law in the Director of Corrections and in his delegate, the superintendent. While that officer should 'consider' the reports from his staff, he is not bound by them." (See *People* v. *Fuller, supra,* 20 Cal. App.3d 159, 165.) As to the claim that the superintendent relied in part on a hearsay statement contained in an interview with a police sergeant the court stated in *Hakeem* (p. 882): "While, for the reasons above stated, a trial court has no jurisdiction (and no competence) to evaluate the significance of criminality on a defendant's fitness for treatment, it does have both power and competence, if requested, to determine whether

or not 'criminality' relied on by the superintendent actually existed. But, although defendant's trial counsel referred to the fact that the sergeant had been repeating hearsay, he made no clear contention that the statement was untrue, nor did he expressly seek a hearing as to the truth of the report or make any kind of offer of proof in that regard. Under these circumstances, he cannot object here." That reasoning is applicable in this case with respect to the matter of the information obtained from Officers Sherwood and Wanek.

The superintendent's conclusion that for the reasons stated defendant was not a fit subject for confinement or treatment in the California Rehabilitation Center was sustained by the factual situation presented to him and was reasonable. If it be assumed that a contrary conclusion could also reasonably be drawn from the record, of the nature of that espoused by the court, the significance thereof is that thereby it is shown that the matter was one which permitted the exercise of discretion. (Cf. *Cadilla* v. *Board of Medical Examiners,* 26 Cal.App.3d 961, 968 [103 Cal.Rptr. 455].) But that discretion has been placed by law in the Director of Corrections, not in the court, and it was error for the court to interfere with the well-founded conclusion of the superintendent who acted on behalf of the director.

The order of June 2, 1972, is reversed with directions to the superior court to cause the defendant to be returned to that court from the California Rehabilitation Center for such further proceedings on the criminal charges, not inconsistent with the opinion herein, as the court may deem warranted.