[No. S102527. Apr. 25, 2002.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF MARIN COUNTY, Respondent;
PATRICK HENRY GHILOTTI, Real Party in Interest.

**COUNSEL**

Bill Lockyer, Attorney General, and Robert R. Anderson, Chief Assistant Attorney General, for Petitioner.

No appearance for Respondent.

Joseph L. Spaeth, Public Defender, Frank J. Cox, Chief Deputy Public Defender, and Edward J. Farrell, Deputy Public Defender, for Real Party in Interest.

Ron Boyer, Deputy Public Defender (Contra Costa); Jean F. Matulis; and John Philipsborn for California Attorneys for Criminal Justice and California Public Defenders Association as Amici Curiae on behalf of Real Party in Interest.

## OPINION ·

**BAXTER, J.**—The Sexually Violent Predators Act (SVPA or Act) (Welf. & Inst. Code, § 6600 et seq.)[1] provides a court process by which certain convicted violent sex offenders, whose current mental disorders make them likely to reoffend if free, may be committed, at the end of their prison terms, for successive two-year periods of state hospital confinement and treatment as long as the disorder-related danger persists. Before an SVPA commitment or recommitment proceeding may even be initiated, at least two mental health professionals designated by the Director of the State Department of Mental Health (Director) must evaluate the candidate under a standardized assessment protocol to determine whether, as the result of a diagnosed mental disorder, the person is likely to commit new acts of criminal sexual violence unless confined and treated. (§ 6601.)

Petitioner Patrick Henry Ghilotti served two separate prison terms for multiple violent sex offenses committed in Marin County. He has been in state hospital confinement under the SVPA since his second prison term expired in 1998. Recently, psychologists designated by the Director conducted formal evaluations of Ghilotti's current condition to determine whether he should be recommitted for an additional SVPA term, or should instead be released without conditions. The People concede these evaluators ultimately concluded that Ghilotti no longer meets the statutory criteria for commitment.

However, the Director disagreed with the designated evaluators' recommendations. According to the Director, the evaluators' reports agreed that supervision and treatment are important to reduce Ghilotti's risk of reoffense. In the Director's view, the reports actually disclosed a likelihood that Ghilotti will reoffend if released without such conditions. Moreover, the Director asserted, hospital psychiatrists most familiar with Ghilotti's treatment progress are convinced that he is not ready for unconditional release, and that his mental disorder still creates a high danger of reoffense in that circumstance.

Therefore, despite the evaluators' contrary recommendations, the Director wrote to the Marin District Attorney, asking her to file a superior court

---

[1]All further unlabeled statutory references are to the Welfare and Institutions Code.

petition seeking Ghilotti's recommitment. The district attorney did so. The petition attached the Director's letter, which expressed his disagreement with the evaluators' conclusions and indicated his further concern that, by correct statutory criteria, the evaluators' reports actually *supported* Ghilotti's recommitment. Also attached to the petition were declarations from hospital psychiatrists urging that Ghilotti is not yet suitable for unsupervised release.

However, the designated evaluators' reports themselves were not provided to the superior court. The district attorney did not ask the court to review the reports to determine if they reached their conclusions by incorrect statutory standards and were therefore legally deficient. Instead, she argued that the Director may *disregard* the designated evaluators' recommendations, and may request the filing of a petition for commitment or recommitment, if he *independently* concludes the candidate is or remains dangerously disordered and likely to reoffend without treatment and custody.

The superior court expressed concern that the designated evaluators' reports had incorrectly applied the statutory criteria and were thus legally "incompetent." However, the court rejected the district attorney's sole argument that the Director may request a petition without regard to the contrary recommendations of the designated evaluators. Accordingly, the superior court dismissed the petition and ordered Ghilotti's release.

The People sought mandamus and a temporary stay in the Court of Appeal, raising again the single argument the superior court had rejected. The Court of Appeal summarily denied relief, making clear it agreed with the superior court that the Director cannot simply overrule or disregard the designated evaluators' recommendations against commitment.

We granted review and issued an order to show cause, staying Ghilotti's release in the meantime, to address the issue presented in the courts below and to consider certain additional issues that are potentially important to the proper disposition of this and other SVPA proceedings, and otherwise might evade review. The matter was set for expedited briefing and argument. We now reach the following conclusions:

First, contrary to the People's argument below, a petition seeking the commitment or recommitment of a person as a sexually violent predator cannot be filed unless two mental health professionals, specifically designated by the Director under statutory procedures to evaluate the person for this purpose, have agreed, by correct application of the statutory standards, that the person "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody." (§ 6601, subd. (d).)

Second, this statutory standard is met if, because of the person's diagnosed mental disorder, he or she currently presents a *substantial* danger—that is, a *serious and well-founded risk*—of criminal sexual violence unless maintained in an appropriate custodial setting which offers mandatory treatment for the disorder. On the other hand, section 6601, subdivision (d), does *not* require an evaluator to determine there is a *better than even* chance of new criminal sexual violence if the person is free of custody and mandatory treatment. An evaluator's conclusion that one does not meet the criteria for commitment or recommitment is legally erroneous if it stems from a conclusion that, although the person presents a serious and well-founded risk of reoffense if free without conditions, the evaluator cannot say the risk exceeds 50 percent.

Third, an evaluator's recommendation for or against commitment or recommitment is invalid if there appears a reasonable probability it was influenced by the evaluator's legal error, including misinterpretation of the "likely to reoffend" standard. The recommendation of an evaluator is subject to judicial review for such material legal error at the behest of the appropriate party. If, upon review, the court finds no material legal error on the face of the report, the court shall deem the evaluator's recommendation valid, and shall dispose of the petition accordingly. If the court finds material legal error on the face of the report, it shall direct that the erring evaluator prepare a new or corrected report applying correct legal standards.

Because several of the issues we decide are matters of first impression, the courts and parties were unaware of the appropriate procedures at all stages below. Under the circumstances, we conclude we must vacate the Court of Appeal's order denying mandamus. We will remand the cause to the Court of Appeal with directions (1) to issue a writ of mandamus vacating the superior court's order dismissing the recommitment petition, and (2) to remand the matter to the superior court for further proceedings consistent with the views expressed herein.

### FACTS

On November 28, 2001, the Marin District Attorney filed in Marin Superior Court a petition (the 2001 recommitment petition) seeking Ghilotti's recommitment to a two-year term of hospital confinement and treatment under the SVPA.

The 2001 recommitment petition alleged: In March 1979 and September 1985, Ghilotti was convicted in Marin Superior Court of four counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)), which are sexually

violent predatory offenses as defined by the SVPA. The offenses were against multiple victims. In September 1997, as Ghilotti's prison terms for these crimes drew to a close, an SVPA commitment petition, supported by the evaluations of two designated mental health professionals, was filed in Marin Superior Court. In March 1998, a jury found Ghilotti to be a sexually violent predator (SVP) as defined by the Act, and he was committed for a two-year hospital term to expire on March 4, 2000. In December 1999, a recommitment petition, again supported by the reports of two designated evaluators, was filed. A probable cause hearing on the 1999 recommitment petition was set for April 3, 2000. Ghilotti then stipulated to an extension of his term until December 1, 2001.

The 2001 recommitment petition continued: In December 2000, during his extended term, Ghilotti filed a petition under section 6608 for "release into a conditional release plan with terms and conditions. The court made a finding that . . . Ghilotti would be a suitable candidate for conditional release. Ultimately, on October 1, 2001, . . . Ghilotti refused to accept the terms and conditions of release as set forth by the Department of Mental Health and CONREP [(i.e., the conditional release program)] that would permit his release."

The 2001 recommitment petition further alleged: On November 9, 2001, the Director requested the district attorney to seek another two-year SVP commitment for Ghilotti. The request stated the Director's opinion that Ghilotti still suffers from a mental disorder which makes him likely to engage in sexually violent criminal behavior as defined by the Act. The Director's request and opinion were supported by the attached declarations of staff psychiatrists at Atascadero State Hospital, and of the Chief Counsel of the State Department of Mental Health.[2]

---

[2]The declaration of Robert Knapp, M.D., the Medical Director of Atascadero State Hospital, stated: Dr. Knapp has been involved in, and has continually monitored, Ghilotti's treatment progress, most recently by discussions with Ghilotti's treatment team in September 2001. Ghilotti's treatment has not been completed, because it should include a period of supervised outpatient treatment. A supervised release, with mandatory conditions including treatment, is the only means of assuring that, once Ghilotti is unconditionally released, he can apply the self-regulation skills he has learned at Atascadero. Ghilotti's refusal to accept the terms of outpatient treatment is a factor bearing adversely on his risk to reoffend. The designated evaluators have noted Ghilotti's refusal to accept outpatient conditions as an adverse risk factor, cited other factors suggesting a substantial risk of reoffending, and stressed the need for Ghilotti's treatment and supervision in the community, yet conclude he does not meet the criteria for recommitment. Dr. Knapp disagrees with these conclusions and believes recommitment is necessary as an alternative to immediate unconditional release.

The declaration of Mary Flavan, M.D., a staff psychiatrist at Atascadero State Hospital, stated: Ghilotti suffers from paraphilia with narcissistic features, which creates a high risk of sexual misconduct unless the patient is castrated, either surgically or by maintenance on

Finally, the 2001 recommitment petition averred: The district attorney's office was aware that Robert M. Owen, Ph.D., and Wesley B. Maram, Ph.D., had been designated to evaluate Ghilotti pursuant to section 6601, subdivision (d), that the designated evaluators both concluded Ghilotti does not meet the criteria for recommitment, that the Director had "rejected Dr. Maram's evaluation as . . . not meeting the necessary criteria for a Sexual Violent Predator evaluation, and that at the time of the filing of this Petition, another evaluation is being prepared." Despite the "negative conclusion[s]" of Drs. Maram and Owen, the 2001 recommitment petition was being submitted under the authority of subdivision (h) of section 6601, based on the Director's independent opinion that Ghilotti meets the criteria for recommitment.

The 2001 recommitment petition prayed for a probable cause hearing and a jury trial on the issue of Ghilotti's recommitment, and asked that he be ordered held in a secure facility until the matter was resolved.

---

antiandrogen medication (in Ghilotti's case, Luprone). Dr. Flavan recently testified that Ghilotti was suitable for conditional release, but this was contingent on appropriate community supervision, weekly therapy treatment, and maintenance of Ghilotti's Luprone dosage. The success of Atascadero's treatment program depends on completing it, which Ghilotti has not done, since he has not gone through the stage of supervised outpatient treatment. Without completing this stage, Ghilotti "still carries a high risk, similar to his risk before treatment, if unconditionally released." Even after release, his success will require his maintenance on Luprone to lower androgen and testosterone levels. However, 30 years of literature, and Dr. Flavan's own experience, indicate that fewer than 10 percent of hospital-committed sex offenders maintain their medication for more than two or three years after their unmonitored release. "It is very unlikely that . . . Ghilotti will continue taking this medication on his own for very long . . . ." Ghilotti's current means of receiving Luprone, a titanium patch, is easily removeable, and is appropriate only for monitored patients. Moreover, Ghilotti recently experienced a return to potency despite the Luprone patch. He did not inform Atascadero staff of this development, which was discovered when a blood test revealed increased testosterone levels. Ghilotti then began receiving increased Luprone dosages by injection. Though Ghilotti has expressed interest in surgical castration, "it is a very rare person who pursues this on a totally voluntary basis." For all these reasons, Dr. Flavan believes "that releasing . . . Ghilotti from the hospital without ongoing treatment, monitoring of his Luprone therapy, and other supportive supervision puts the community at risk."

The declaration of Carl N. Elder, Jr., Chief Counsel of the State Department of Mental Health (Department), described, and attached excerpts from, expert testimony given by Atascadero staff psychiatrists and others at Ghilotti's hearing on conditional release in May 2001. According to the declaration and excerpts, the testimony was to the effect that Ghilotti's paraphilia (a mental disorder characterized by the impulse to commit violent coercive sexual acts) is permanent and incurable; he represents a relatively small risk of reoffense if supervised in a structured setting including mandatory continuing Luprone treatment and therapy, but he represents a high risk of reoffense without such treatment and therapy. Dr. Flavan testified in particular that Luprone treatment must be monitored and supervised for various reasons, including the drug's unpleasant and medically adverse side effects, which discourage voluntary ingestion.

The reports of the designated evaluators were not attached to the 2001 recommitment petition. However, the petition did attach the Director's letter requesting that the petition be filed. As indicated above, this letter stated the Director's view that, as a result of his mental disorder, Ghilotti "is likely to engage in sexually violent criminal behavior, and thus continues to meet the legal requirement for . . . commitment [under the SVPA]."

The letter also expressed the Director's concerns about the validity of the designated evaluators' recommendations. The letter noted that "[t]he Department [had] communicated with the evaluators that . . . Ghilotti [had] refused to accept the [*conditional* release] program [recently] offered by the Department and the court. The evaluations thus needed to reflect whether . . . Ghilotti was likely to engage in acts of sexual violence due to his mental disorder *given the absence of community supervision and treatment*, if [*unconditionally*] released from hospital treatment and custody. Both psychologists concluded that the lack of community treatment constituted a risk factor that could lead . . . Ghilotti to return to committing sexually violent acts. [¶] *Despite citing the importance of community supervision in their reports*, each psychologist concluded that . . . Ghilotti does *not* meet the criteria of a sexually violent predator as set forth in [section] 6600 et seq. These conclusions are based on their judgment as to the degree of risk for reoffense. *Nonetheless, it is my opinion that each evaluator makes a threshold case in the body of each report that . . . Ghilotti is 'likely' to reoffend.*" (Italics added.)

On November 29, 2001, Ghilotti filed a written response, which challenged the legal validity of the 2001 recommitment petition. This pleading said: The 2001 recommitment petition conceded that two mental health professionals designated by the Director to evaluate whether Ghilotti now meets the criteria for recommitment had concluded he does not do so. Furthermore, Ghilotti's counsel had that day received the reports of *three* psychologists, Drs. Maram and Owen, and Dale R. Arnold, Ph.D., "all of whom agree that Mr. Ghilotti does not now meet the statutory or forensic definitions of a sexually violent predator." Under subdivision (d) of section 6601, an SVPA petition for commitment or recommitment cannot be filed without the concurrence of two such designated evaluators. Accordingly, the 2001 recommitment petition should be dismissed, and Ghilotti should be released no later than December 1, 2001.

The district attorney filed a reply on November 29, 2001. She argued that under subdivision (h) of section 6601, the Director may request a commitment or recommitment *petition if,* regardless of the opinions of the designated evaluators, he himself determines, on adequate evidence, that the person is an SVP.

The superior court heard the matter on November 29, 2001. Present on behalf of the 2001 recommitment petition were a deputy from the Marin District Attorney's Office, and Carl N. Elder, Jr., the Department's Chief Counsel. The deputy district attorney acknowledged that since the filing of the 2001 recommitment petition, a third designated evaluator had prepared a report opining that Ghilotti does not meet the criteria for recommitment as an SVP. The deputy district attorney reiterated the argument that notwithstanding the evaluators' views, subdivision (h) of section 6601 allows the Director to make an independent determination justifying the filing of a recommitment petition.

The superior court immediately indicated its doubt about this statutory argument, suggesting that the statute's plain wording appears to require the concurrence of designated evaluators. On the other hand, though the designated evaluators' reports had not been placed before it, the court stated its concern, based on the papers which were presented, that the designated evaluators' determinations might be legally "incompetent," in that they had misapplied the statutory criteria.[3] The court questioned Elder at length about whether the *Department* has taken steps to assure that its evaluators are applying correct criteria to reach their conclusions. However, when the deputy district attorney finally asked if it would be helpful for the court to review the reports, the court stated its belief that such review "is [not] really my province."

The court suggested it would feel more comfortable about proceeding if the *Department* would declare *it* had "determined [the existing evaluations] to be incompetent and [was] setting about finding appropriate evaluations based on correct criteria." Elder expressed doubt he could "direct my Director to refer to [the reports] as incompetent." Nonetheless, at the deputy district attorney's request, the court ordered a one-day continuance to allow the Department to reconsider its position and, if it desired, to offer additional information based on the court's remarks.

The hearing resumed the following day, November 30, 2001. The deputy district attorney indicated that he had nothing further to offer. Accordingly,

---

[3]The court explained it had ruled, during Ghilotti's original commitment proceedings in 1998, that factors bearing on whether Ghilotti might pursue voluntary treatment once at liberty should not be considered by the designated evaluators in determining his risk of reoffense, and this ruling had been upheld on appeal. As the basis for its suspicion that the current designated evaluators in Ghilotti's case were not applying this rule, the court apparently referred to materials attached to the petition, including the Director's letter and the declaration of Dr. Knapp, which stated that the evaluators had concluded Ghilotti did not meet the criteria for recommitment despite stressing his need for treatment and supervision in the community.

the court dismissed the petition and, finding no pending proceeding, declined to issue a temporary stay of Ghilotti's release.

 The same day, November 30, 2001, the People, represented by the Attorney General, filed in the Court of Appeal a petition seeking mandamus and/or prohibition to overturn the trial court's dismissal order, and a temporary stay of Ghilotti's release.[4] The mandate petition acknowledged that the evaluators designated by the Director to determine whether Ghilotti meets the criteria for recommitment had concluded he does not meet those criteria. The mandate petition reiterated the argument that an SVPA recommitment petition can be filed even absent the concurrence of designated evaluators.

Again on November 30, 2001, the Court of Appeal, First Appellate District, Division Four, summarily denied relief. The Court of Appeal's order stated: "A petition for commitment or recommitment under the [SVPA] shall only be filed if both mental health professionals selected to perform evaluations concur the person to be committed meets the criteria for commitment. (Welf. & Inst. Code, § 6601, subd[s]. (d), (f); *Peters v. Superior Court* (2000) 79 Cal.App.4th 845, 851 [94 Cal.Rptr.2d 350]. As the [mandate] petition admits that the mental health experts selected to evaluate [Ghilotti] concluded he did not meet the criteria for commitment, there was no legal basis for the petition for recommitment as a sexually violent predator."

The People immediately sought review and a stay in this court. On November 30, 2001, the Chief Justice issued a temporary stay of Ghilotti's release from confinement pending the full court's consideration of the petition for review, and ordered Ghilotti to file written opposition on or before December 7, 2001. On December 6, 2001, Ghilotti filed a written opposition as directed.

On December 12, 2001, we granted review and directed issuance of an order to show cause. Our order included a reference to the relatively narrow issue presented to the courts below, namely, whether subdivision (h) of section 6601 allows the filing of a petition for recommitment or recommitment under the SVPA without the concurrence of two designated mental health evaluators.

---

[4]Dismissal of a petition for involuntary civil commitment is an appealable final judgment (Code Civ. Proc., § 904.1, subd.· (a)(1); *People v. Superior Court (Johannes)* (1999) 70 Cal.App.4th 558, 561, fn. 5 [82 Cal.Rptr.2d 852] [SVPA]; *People v. Superior Court (Myers)* (1996) 50 Cal.App.4th 826, 834 [58 Cal.Rptr.2d 32] [Mentally Disordered Offender Law]), but the People may alternatively seek writ review, and a stay, when the appellate remedy is inadequate (Code Civ. Proc., § 1086) because the dismissal will result in the release of one potentially dangerous to the public. (*Johannes, supra,* at p. 561, fn. 5; *Myers, supra,* at p. 834.)

However, the case presents additional concerns of substantial importance. The Director, and hospital psychiatrists familiar with Ghilotti's case, have invoked the SVPA's core public safety concerns by asserting that Ghilotti remains likely to reoffend, within the meaning of the statute, if unconditionally released. The Director has further voiced reservations about the means by which Ghilotti's evaluators reached contrary conclusions. These matters were alluded to in the proceedings below, where the superior court itself questioned the legal "[ ]competence" of the designated evaluators' conclusions and expressed doubt that Ghilotti is suitable for unsupervised release. However, there was understandable uncertainty about how to proceed in this situation.

▆▆ ▬ ▬ We therefore deemed it necessary to expand our order to include additional issues.[5] Accordingly, our order also directed the parties to brief and argue the following questions: First, if section 6601 allows the filing of a commitment or recommitment petition only with the concurrence of designated evaluators, when, if ever, should the trial court examine evaluators' reports for material legal error, and what steps should be taken if such error is found? Second, what is the meaning of the statutory standard on which the evaluators are to opine, i.e., whether the person under evaluation has a diagnosed mental disorder "so that he or she is *likely* to engage in acts

---

[5]"As a matter of policy," we generally will not consider on review any issue which could have been, but was not, raised in the courts below. (Cal. Rules of Court, rule 29(b)(1).) However, we are empowered, upon review, to "decide any or all issues in the cause." (*Id.*, rule 29.2(a).) In a number of cases, this court has decided issues raised for the first time before us, where those issues were pure questions of law, not turning upon disputed facts, and were pertinent to a proper disposition of the cause or involved matters of particular public importance. (E.g., *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464, 469, fn. 2 [84 Cal.Rptr.2d 852, 976 P.2d 223]; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 7-8, fn. 2 [74 Cal.Rptr.2d 248, 954 P.2d 511]; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1118 [245 Cal.Rptr. 658, 751 P.2d 923]; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654 & fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261].) (Though Justice Moreno suggests mandamus is unavailable except to correct a lower court's *error* in addressing an issue directly presented to that court (conc. & dis. opn. of Moreno, J., *post*, at p. 936), both *Temple Community Hospital* and *Cedars-Sinai Medical Center*, cited above, arose on mandamus.) We note our somewhat analogous discretion to retain appeals that are moot, or otherwise technically defective, when they present significant issues which are capable of repetition but likely to evade review. (E.g., *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151]; *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122 [105 Cal.Rptr.2d 46, 18 P.3d 1198]; *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5 [36 Cal.Rptr.2d 40, 884 P.2d 988]; *DiGiorgio Fruit Corp. v. Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487]; see *Dix v. Superior Court* (1991) 53 Cal.3d 442, 454 [279 Cal.Rptr. 834, 807 P.2d 1063] [lack of standing].) The legal standards to be applied by designated evaluators, and the circumstances, if any, in which recommendations by such evaluators are subject to judicial review for legal error (see text & fn. 6, *post*) appear to be such issues.

of sexual violence *without appropriate treatment and custody*" (§ 6601, subd. (d), italics in order)?[6]

Our order further provided: "Pending resolution of the petition for writ of mandate or further order of this court, whichever occurs sooner, the trial court's order dismissing the petition for petitioner's recommitment under the [SVPA], petitioner's release from confinement in a secure mental health facility, and all further trial court proceedings in this matter, are hereby stayed. (*People v. Superior Court (Johannes)* (1999) 70 Cal.App.4th 558, 561-562, fn. 5 [when a trial court dismisses a petition filed under the [SVPA], 'the People . . . may seek writ review and a temporary stay where the dismissal will result in the release of one potentially dangerous to the public, until the propriety of the dismissal order can be reviewed']; *People v. Superior Court (Myers)* (1996) 50 Cal.App.4th 826, 833-835 [similar holding with regard to the Mentally Disordered Offender Law (Pen. Code, § 2960 et seq.].)"

We turn to an examination of the specified issues.

## DISCUSSION

### A. *Overview of the SVPA.*

The SVPA took effect on January 1, 1996. (Stats. 1995, ch. 763, § 3.) It provides for the involuntary civil commitment of certain offenders, following the completion of their prison terms, who are found to be SVP's because they have previously been convicted of sexually violent crimes and currently suffer diagnosed mental disorders which make them dangerous in that they are likely to engage in sexually violent criminal behavior. (§ 6600 et seq.)

---

[6]Our order, signed by all current members of the court, specified the issues to be argued as follows: "(1) Does Welfare & Institutions Code section 6601, subdivision (h), allow the State Department of Mental Health to request the filing of a petition for recommitment under the [SVPA] (*id.*, § 6600 et seq.) without the concurrence of two mental health evaluators that the person 'has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody' (*id.*, § 6601, subd. (d))? [¶] (2) If the answer to question (1) is 'no', and the filing of such a petition is challenged on the ground that it lacks the concurrence of two mental health evaluators that the person meets the criteria set forth in section 6601, subdivision (d), should the trial court independently examine the evaluators' reports to determine whether the reports reflect application of the correct legal interpretation of the statutory criteria, and, if they do not, should the trial court examine whether the evaluators' assessments, viewed in light of the correct standard, would support the filing of a petition? [¶] (3) What is the correct legal interpretation of the phase '*likely* to engage in acts of sexual violence *without appropriate treatment and custody*' (italics added) as used in section 6601, subdivision (d)?"

We subsequently granted the application of California Attorneys for Criminal Justice and the California Public Defenders Association to file a joint amicus curiae brief in Ghilotti's behalf. Such a brief has been filed.

One's initial or extended commitment under the SVPA depends upon his or her status as an SVP. An SVP is "a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.*, subd. (c).)

"The process for determining whether a convicted sex offender meets the foregoing requirements takes place in several stages, both administrative and judicial. Generally, the Department of Corrections screens inmates in its custody who are 'serving a determinate prison sentence or whose parole has been revoked' at least six months before their scheduled date of release from prison. (§ 6601, subd. (a).) . . . . If officials find the inmate is likely to be an SVP, he is referred to the Department . . . for a 'full evaluation' as to whether he meets the criteria in section 6600. (§ 6601, subd. (b).)" (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1145 [81 Cal.Rptr.2d 492, 969 P.2d 584] (*Hubbart*), fn. omitted.)

"The . . . Department . . . shall evaluate the person in accordance with a standardized assessment protocol . . . to determine whether the person is a sexually violent predator as defined in this article. The standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders[, including] criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).)

"Pursuant to subdivision (c) [of section 6601], the person shall be evaluated by two practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director . . . . If both evaluators concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody, the Director shall forward a request for a [commitment] petition . . . to the county designated in [section 6601,] subdivision (i)" (§ 6601, subd. (d)), i.e., the county where the offender was convicted of the crime for which he is currently imprisoned.

If one such evaluator finds that the person meets the criteria set forth in section 6601, subdivision (d), but the other evaluator disagrees, "the Director

. . . shall arrange for further examination of the person by two independent professionals." (§ 6601, subd. (e).) Persons designated as "independent professional[s]" may not be state government employees, "shall include psychiatrists and licensed psychologists who have a doctoral degree in psychology," and must have at least five years of experience in the diagnosis of mental disorders. (*Id.*, subd. (g).) "If an examination by independent professionals pursuant to subdivision (e) [of section 6601] is conducted, a petition [for] commitment . . . shall only be filed if both independent professionals . . . concur that the person meets the criteria for commitment specified in [section 6601,] subdivision (d)." (§ 6601, subd. (f).)

"[I]f the . . . Department . . . determines that the person is a sexually violent predator as defined in this article, the Director . . . shall forward a request for a [commitment] petition . . . to the county designated in [section 6601,] subdivision (i)." (§ 6601, subd. (h).) When a petition request is forwarded by the Director, and the county's legal counsel agrees with the request, a petition for commitment is filed in the superior court. (§ 6601, subd. (i).)

"The filing of the petition triggers a new round of proceedings under the Act. The superior court first holds a hearing [at which the person is entitled to the assistance of counsel] to determine whether there is 'probable cause' to believe that the person named in the petition is likely to engage in sexually violent predatory criminal behavior upon release. (§ 6602, as amended by Stats. 1996, ch. 4, § 4, and by Stats. 1998, ch. 19, § 3.) . . . If no probable cause is found, the petition is dismissed. However, if the court finds probable cause within the meaning of this section, the court orders a trial to determine whether the person is an SVP under section 6600. . . . (§ 6602[, subds. (a), (b)].)" (*Hubbart, supra*, 19 Cal.4th 1138, 1146-1147, fns. omitted.)

"At trial, the alleged predator is entitled to 'the assistance of counsel, the right to retain experts or professional persons to perform an examination on his or her behalf, and [to] have access to all relevant medical and psychological records and reports.' (§ 6603, subd. (a).) Either party may demand and receive trial by jury. (*Id.*, subds. (a) & (b); see *id.*, subd. (c).)" (*Hubbart, supra*, 19 Cal.4th 1138, 1147.)

"The trier of fact is charged with determining whether the requirements for classification as an SVP have been established 'beyond a reasonable doubt.' (§ 6604.) Any jury verdict on the issue must be 'unanimous.' (§ 6603, subd. (d).) . . . [W]here the requisite SVP findings are made, 'the person shall be committed for two years to the custody of the . . . Department . . . for appropriate treatment and confinement in a secure facility . . . .' ([§ 6604].)" (*Hubbart, supra*, 19 Cal.4th 1138, 1147.)

Any extended term of commitment shall also be for two years, and shall commence on the day the previous term expires. (§ 6604.1, subd. (a).) As a prerequisite to any recommitment for an extended term, "[t]he person shall be evaluated by two practicing psychologists or psychiatrists, or by one practicing psychologist and one practicing psychiatrist, designated by the . . . Department . . . . The provisions of subdivisions (c) to (i), inclusive, of Section 6601 shall apply to evaluations performed for purposes of extended commitments. The rights, requirements, and procedures set forth in Section 6603 shall apply to extended commitment proceedings." (§ 6604.1, subd. (b).)

## B. *Issues presented*

1. *May an SVPA recommitment petition be filed without the concurrence of two designated evaluators, as set forth in section 6601, subdivision (d), or two independent evaluators, as set forth in section 6601, subdivisions (e) and (f)?*

■ As below, the People argue that the Director may request the filing of a petition for commitment or recommitment even if the evaluations performed under subdivisions (c) through (f) of section 6601 do not produce the concurrence of two designated evaluators under subdivision (d), or of two independent professionals under subdivisions (e) and (f), that the person meets the criteria for commitment. The People point to subdivision (h) of section 6601, which states that the Director "shall" request such a petition "[i]f the . . . *Department* . . . *determines* that the person is a sexually violent predator as defined in this article. . . ." (Italics added.) In the People's view, subdivision (h) operates independently of subdivisions (c) through (f), and makes such a request mandatory if, despite the evaluators' contrary conclusions, the Director himself, upon reviewing the evidence, reaches a "determin[ation]" that the person is, or remains, an SVP.

We agree with the superior court and the Court of Appeal that this is not a plausible reading of the statute. ■ " 'To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent.' [Citation.] If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. [Citation.] 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.]" (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].)

■ Here, the plain language of section 6601 refutes the People's argument. Subdivisions (b) through (g) of section 6601 set forth the procedures, including the concurrence of two mental health evaluators, by which

the Department must make the "determin[ation]" to which subdivision (h) refers. Subdivision (h), in turn, refers to a "determin[ation]" made *by resort to* those procedures, not in disregard of them.

As we have seen, subdivision (b) of section 6601 provides that when a person may be eligible for commitment or recommitment as an SVP, the person shall undergo a "full *evaluation*" by the Department. (Italics added.)

Under subdivision (c) of section 6601, the Department "shall *evaluate* the person" (italics added) by means of a "standardized assessment protocol" that considers diagnosable mental disorders and various factors known to bear upon a sex offender's risk of reoffense.

Under subdivision (d) of section 6601, "the person shall be *evaluated*" (italics added) by two practicing psychologists or psychiatrists "designated by the Director," and if both "evaluators" *agree* "that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody," *the Director "shall forward"* a petition request to the proper county. (Italics added.)

However, under subdivision (e) of section 6601, if "the professionals performing the evaluation pursuant to subdivision (d)" are *split* on whether the person meets the criteria for commitment or recommitment, "the Director . . . *shall* arrange for further examination of the person by *two independent professionals*" (italics added) who meet qualifications set forth in section 6601, subdivision (g).

Under subdivision (f) of section 6601, a petition *"shall only* be filed *if both independent professionals who evaluate the person pursuant to subdivision (e) concur* that the person meets the criteria for commitment specified in subdivision (d)." (Italics added.)

Finally, under subdivision (h) of section 6601, the Director "shall" forward a petition request to the appropriate county "[i]f the . . . Department . . . determines that the person is a sexually violent predator as defined in this article . . . ." *"Copies of the evaluation reports* and any other supporting documents shall be made available" to the county's attorney. (*Ibid.*, italics added.)

The clear import of this scheme is that the Department's "determin[ation]" under section 6601, subdivision (h), is governed by the evaluation procedure described at length in subdivisions (c) through (g) of the same section. When subdivisions (c) through (h) of section 6601 are read together, they ascribe

the Director's authority as follows: Before requesting a petition, the Director *must* designate two mental health professionals to evaluate the person. If these two evaluators agree that the person meets the criteria for commitment, the Director *must* request a petition. If, however, these first two evaluators do not agree on that issue, the Director *must* arrange a further examination by two *independent* professionals. If these independent professionals also do not concur that the person meets the criteria for commitment, the Director *may not* request the filing of a petition.

The authorities uniformly support our conclusion. In *Hubbart, supra,* 19 Cal.4th 1138, we said that "[t]wo evaluators must agree that the inmate is mentally disordered and dangerous within the meaning of section 6600 in order for proceedings to go forward under the Act. (§ 6601, subd. (d).)" (*Hubbart, supra,* at p. 1146; see also *Albertson v. Superior Court* (2001) 25 Cal.4th 796, 799 [107 Cal.Rptr.2d 381, 23 P.3d 611].) The Courts of Appeal have so assumed, specifically applying the rule to *extended* commitments under the SVPA. (*People v. Superior Court (Gary)* (2000) 85 Cal.App.4th 207, 213-218 [101 Cal.Rptr.2d 874]; *Peters v. Superior Court, supra,* 79 Cal.App.4th 845, 848-851; *Butler v. Superior Court* (2000) 78 Cal.App.4th 1171, 1178-1182 [93 Cal.Rptr.2d 468] (*Butler*).) As the *Butler* court remarked, "The Legislature specifically provided that the [Department] may not request a petition for commitment if only one of the two evaluators concludes that the person meets the criteria for commitment under the SVPA. (§ 6601, subd. (e).) This indicates that the Legislature felt it important for two professionals to concur in their evaluations of a potential SVP's mental condition before a petition for commitment could be filed." (*Butler, supra,* at p. 1180.)

A 2000 amendment to section 6604.1 added subdivision (b), making clear that the evaluation process set forth in "subdivisions (c) to (i), inclusive," of section 6601 applies to petitions for recommitment for extended terms under the SVPA. At least one Court of Appeal has ruled that section 6604.1, subdivision (b), precludes the filing of a recommitment petition without the concurrence of two professional evaluators under section 6601. (*People v. Superior Court (Preciado)* (2001) 87 Cal.App.4th 1122, 1127 [105 Cal.Rptr.2d 159].)

The People urge, however, that subdivisions (d) through (f) of section 6601 must be reconciled with subdivision (h), which requires the Department to request a petition if *it* "determines that the person is a sexually violent predator." Indeed, the People suggest, the responsibility for a "full evaluation" of the person (§ 6601, subd. (b)), as provided in subdivisions (b) and (c) of section 6601, is not placed on the individual evaluators described

in subdivisions (d) through (f), but on the Department as a distinct entity, and the evaluators' conclusions do not negate the Department's independent duty to "determine[ ]," under subdivision (h), who is an appropriate candidate for commitment or recommitment.

All subdivisions of section 6601 may be harmonized to this end, the People assert, by construing that section as follows: The Director *must* request a petition if the evaluators designated under subdivision (d) concur; he *may* do so if the independent evaluators appointed under subdivision (e) concur; but in any event, he *must* do so if he independently determines, under subdivision (h), that the person under examination is an SVP.

However, the People's proposed construction ignores the express language of subdivisions (e) and (f) of section 6601. That language specifies that if the two original evaluators fail to agree the person should be committed or recommitted, the Director "shall arrange" for additional evaluations by "two independent professionals" (*id.,* subd. (e)), and a petition "shall *only* be filed if both independent professionals" agree (*id.,* subd. (f), italics added). Indeed, subdivision (h) of section 6601 itself makes clear that the "determin[ation]" described in subdivision (h) flows from the evaluation process. The subdivision provides that when, upon the Department's "determin[ation]," a petition request is forwarded, "[c]opies of the evaluation reports . . . shall be made available" to the attorney for the petitioning county.

Contrary to the People's assertion, this interpretation of the statutory scheme does not negate subdivision (h) of section 6601. Subdivision (h) importantly provides that once the Department *does* "determine," by the process set forth in the preceding subdivisions, that the person meets the criteria for commitment or recommitment, "the Director . . . *shall* forward a request for a petition." (Italics added.)

The People insist that the purpose of the Act, i.e., to protect the public from dangerously disordered sex offenders, is best served by allowing the Director independently to determine the current mental status of an offender, such as Ghilotti, who is already under the Director's treatment and custody. As the People observe, the Director, through consultation with the day-to-day treatment staff, may be better situated to assess the person's condition than outside evaluators.

Be that as it may, we cannot contravene the plain statutory language. As the *Butler* court indicated, in view of the loss of liberty involved in an involuntary SVP commitment, the Legislature may have felt that the initial

screening process should include the formal concurrence of two mental health professionals. (See *Butler, supra,* 78 Cal.App.4th 1171, 1180.)[7]

Accordingly we, like the courts below, conclude that a petition for commitment or recommitment may not be filed unless two evaluators, appointed under the procedures specified in section 6601, subdivisions (d) and (e), have concurred that the person currently meets the criteria for commitment under the SVPA.

 2. *May and should the superior court review the evaluators' reports to determine whether they are infected with legal error?*

 As we have explained, a petition for commitment or recommitment under the SVPA cannot be filed unless two designated evaluators under section 6601, subdivision (d), or two independent evaluators under section 6601, subdivision (e), concur that the person meets the criteria for commitment. Insofar as the evaluators' recommendations represent the application of their professional expertise and judgment within statutory requirements, those recommendations conclusively determine whether an SVPA petition may be filed.

 On the other hand, the statute does not allow the evaluators utter free rein. Instead, it imposes certain specific standards on their assessments. They

---

[7]Though the limited record does not make the point crystal clear, it appears that in this case, the evaluators designated by the Director under subdivision (d) of section 6601 were not employees of the Department, or at least were not staff doctors familiar with Ghilotti's day-to-day treatment and progress. While the 2001 recommitment petition attaches the supporting declarations of two Atascadero psychiatrists, Drs. Knapp and Flavan, the People have not contended that these doctors are evaluators designated under section 6601, subdivision (d), or that their declarations meet the formal requirements for a full assessment of the person's mental status as set forth in section 6601, subdivisions (b) and (c). On the contrary, the People have conceded throughout that three other persons, Drs. Maram, Owen, and Arnold, were designated as evaluators under section 6601, subdivision (d), and that their evaluations do not support recommitment. In their reply brief in this court, and at oral argument, the People have indicated that Drs. Maram, Owen, and Arnold are not Department employees.
 We observe that nothing in the SVPA appears to preclude the use of Department employees, including staff psychologists and psychiatrists directly involved in the treatment of an already committed person, as the initial designated evaluators under section 6601, subdivision (d). If additional examinations are needed under subdivision (e), they must be performed by independent professionals, who may not be state government employees. (§ 6601, subds. (e), (g).) But no similar requirement of independence applies to the evaluators first selected under subdivision (d). They need only be "two practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director." (§ 6601, subd. (d).) Particularly in the case of an already committed person like Ghilotti, the Director may well choose to use members of the state hospital staff as subdivision (d) evaluators, only resorting to independent evaluators under subdivision (e) if the subdivision (d) evaluators do not agree that the person meets the criteria for recommitment.

must examine the person "in accordance with a standardized assessment protocol" that considers "diagnosable mental disorders, as well as various factors," including "criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder," which factors are "known to be associated with the risk of reoffense among sex offenders." (§ 6601, subd. (c).) On this basis, the evaluators are to answer a crucial question, i.e., whether "the person has a diagnosed mental disorder so that he or she is *likely* to engage in acts of sexual violence *without appropriate treatment and custody*." (*Id.*, subd. (d), italics added.) The evaluators' *professional* judgment is therefore to be exercised within a specified *legal* framework, and their legally accurate understanding of the statutory criteria is crucial to the Act's proper operation.

In the case before us, questions have arisen whether one or more of the designated evaluators, lacking guidance as to the meaning of the statutory criteria, may have understood them inaccurately, and thus committed legal error, when reaching conclusions that Ghilotti does not qualify for recommitment under the SVPA. We must therefore determine the means of resolving that issue.

The SVPA contains no express provision for judicial review of the reports of designated evaluators to determine whether they are infected with legal error. It appears to be an issue of first impression whether a court entertaining a petition for an involuntary civil commitment has authority to review for legal error the expert evaluations which are a prerequisite to the filing of such a petition. Under the SVPA, however, an affirmative conclusion is inherent in the statutory scheme, and in the nature of the judicial power.

As we have indicated, the SVPA makes the evaluators' conclusions, reached pursuant to the specific procedures and standards described above, critical to the legal authority to file a petition for commitment or recommitment. (§ 6601, subds. (d)-(f).) Without the concurrence of two evaluators, as set forth in the statute, no such petition may be filed, and the person must be unconditionally released without further proceedings to determine if he or she is an SVP. On the other hand, with such concurrence, a petition may be filed, and proceedings to determine whether the person is an SVP may go forward. The statutory scheme thus necessarily calls into question whether the evaluators, in reaching their conclusions at this critical gatekeeping stage, have accurately understood the statutory criteria. When such a question arises, the superior court entertaining the petition must address it.

A distant analogy arises under the law allowing diversion of certain convicted persons for hospital treatment of their narcotics addictions.

(§ 3050 et seq.) Under this law, a court, upon finding that the person is addicted, or in imminent danger of being addicted, to narcotics, and that the person's pattern of criminality does not make him or her an unfit subject for diversion, may suspend execution of the sentence and commit the person to the California Rehabilitation Center (CRC) for appropriate treatment. (§ 3051.) However, if the Director of Corrections thereafter determines that "because of excessive criminality or for other relevant reason," the person "is not a fit subject" for detention and treatment at CRC, that official shall return the person to the superior court for resumption of criminal proceedings. (§ 3053, subd. (a).) Though the CRC diversion statute does not expressly provide for judicial review of the decision of the Director of Corrections, case law has long held that the decision is judicially reviewable. (E.g., *People v. Toscano* (1977) 69 Cal.App.3d 140, 146-147 [137 Cal.Rptr. 893] [noting People's right of appeal from judicial decision recommitting person to CRC after rejection by Director of Corrections]; *People v. Peoro* (1976) 56 Cal.App.3d 35, 39 [128 Cal.Rptr. 130] [same]; *People v. Munoz* (1973) 31 Cal.App.3d 87, 91 [107 Cal.Rptr. 451] [same]; *People v. Morgan* (1971) 21 Cal.App.3d 33, 38-39 [98 Cal.Rptr. 165]; *People v. Berry* (1967) 247 Cal.App.2d 846, 849-850 [56 Cal.Rptr. 123].)

We say the analogy is "distant" because the procedural contexts of the two schemes are not identical. Under the CRC diversion statute, the Director makes a final decision to reject an already committed divertee (§ 3053, subd. (a)), while under the SVPA, the evaluators' reports simply determine whether a commitment petition may be filed in the first instance. However, the premise is the same; the court has authority to provide legal oversight of an administrative determination which involves the exercise of discretion or judgment subject to statutory standards, and which has a legal effect on proceedings properly before the court.[8]

---

[8]Under the CRC diversion scheme, when it appears to the superior court, after imposition of sentence, that the person may be an actual or potential addict and is otherwise eligible for diversion, the court must appoint one, and sometimes two, physicians to examine the person and prepare a report. The report shall be delivered to the court, and if the report indicates the person is not an actual or potential addict, "it shall so certify and return the defendant to the . . . superior court . . . for the ordering of the execution of the sentence." (§ 3051.) If, on the other hand, the physicians' report indicates that the person is an actual or potential addict, the court must conduct a full hearing to determine that status before committing the person to CRC. (*Ibid.*) At least one case has held that upon a negative addiction finding by the reporting physicians, "the superior court is without jurisdiction to act except to dismiss the narcotics addiction commitment petition and refer the matter back for resumption of criminal proceedings." (*Hendricks v. Superior Court* (1978) 81 Cal.App.3d 950, 955 [146 Cal.Rptr. 798].) But in *Hendricks*, the defendant sought to challenge the negative reports on their merits by cross-examining the physicians and presenting his own evidence. As we explain in the text, the superior court's review of evaluators' reports to determine the validity of an SVPA commitment or recommitment petition is limited to whether a report is infected with material

Ghilotti urges that the SVPA's requirement of the concurrence of two evaluators (§ 6601, subds. (d)-(f)), together with the statute's failure to provide specifically for judicial review of the evaluators' reports, gives rise to a statutory right, and thus a state-created constitutional due process right (see *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [100 S.Ct. 2227, 2229-2230, 65 L.Ed.2d 175]), to unquestioning reliance on the evaluators' conclusions. Under these circumstances, Ghilotti insists, any judicial review of the evaluators' analyses constitutes an act in excess of jurisdiction. (See *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942, 132 A.L.R. 715].)

We disagree. Ghilotti's arguments beg the question of what the SVPA requires or forbids. As we have explained, the requirement that SVPA evaluators apply *criteria set forth in the statute* invokes the inherent judicial power to determine whether an evaluator's recommendation stems, on its face, from an inaccurate understanding of those criteria, and thus constitutes legal error. Nothing in the SVPA indicates otherwise.

Of course, the court entertaining an SVPA commitment or recommitment petition does not have a sua sponte duty to examine the reports of designated evaluators in every case. The court should exercise its authority to do so only where the issue is properly in dispute.

On the other hand, the Director, who has custody of persons committed under the SVPA, oversees their diagnosis and treatment while they are committed, and is responsible for the initiation of commitment or recommitment proceedings, cannot be powerless to take action for the public safety when he disagrees, on legal grounds, with evaluators' conclusions that a person does not meet the criteria for commitment or recommitment. Means must exist by which he can make that issue the subject of judicial inquiry.

Thus, in future cases like this one, when the Director (1) receives one or more formal evaluations that recommend against commitment or recommitment, (2) disagrees with those recommendations, (3) believes they may be infected with material legal error, and (4) does not choose, or is not permitted within the statutory scheme, to seek additional evaluations, he may nonetheless forward a request that an SVPA commitment or recommitment petition be filed, and the county's attorney may submit such a petition for filing, with copies of the evaluators' reports attached. (See, e.g., *In re Parker* (1998) 60 Cal.App.4th 1453, 1468-1469, fn. 15 [71 Cal.Rptr.2d 167].) The person named in the petition may then file a pleading challenging the

---

*legal error;* neither the person potentially subject to commitment nor the petitioning authority is entitled at this stage to an evidentiary hearing on the *accuracy* of the evaluations.

validity of the petition on grounds that it is not supported by the concurrence of two evaluators under section 6601, subdivisions (d) through (f). In response, the petitioning authorities may defend the petition by asserting that one or more nonconcurring reports are infected by legal error.

Similarly, if the Director has obtained reports that *do concur* the person meets the criteria for commitment or recommitment, and a petition is filed on that basis, the evaluators' reports should also be attached to the petition. The person may then file a pleading challenging the petition's validity on grounds that one or more of the supposedly concurring reports are infected by legal error.[9]

We stress that such judicial review is limited to whether one or more evaluators' reports are infected by material legal error. An evaluator's report is infected with legal error if, on its face, it reflects an inaccurate understanding of the statutory criteria governing the evaluation.

On the other hand, judicial review of an evaluator's report does not extend to matters of debatable professional judgment within an evaluator's expertise. The professional determinations of an evaluator, insofar as based on consideration and application of correct legal standards, is conclusive at the initial screening stage set forth in section 6601.

If the court concludes that one or more evaluators has committed legal error in reaching his or her conclusions, the court must further determine whether the error is *material*. An evaluator's legal error shall be deemed material if, and only if, (1) there appears a reasonable probability, sufficient to undermine confidence in the outcome, that the error affected the evaluator's ultimate conclusion, and (2) a change in the evaluator's conclusion would either supply, or dissolve, the necessary concurrence of two designated evaluators.

If the court's review of the reports indicates that the conclusions drawn by the evaluators are not infected by legal error as indicated above, or that any error was immaterial, it must accept the recommendations set forth in the reports and take the appropriate responsive action, either by dismissing the petition, or by going forward with proceedings to determine whether the person is an SVP. If the court finds material legal error in an evaluator's report, the court shall provide the evaluator opportunity promptly either to

---

[9]Because the question whether an evaluator's report is infected with legal error can be litigated in the context of a direct challenge to the filing of a commitment or recommitment petition, we see no need to adopt the People's proposal for procedures which are "the functional equivalent of a petition for mandamus (Code Civ. Proc., § 1084 et seq.) seeking review of an agency's [i.e., the evaluators'] action."

correct the report or to prepare a new report, so as to set forth the conclusions the evaluator reaches under correct legal principles.[10]

Ghilotti and his amici curiae claim the People waived judicial examination of the evaluators' reports in this case because they expressly disclaimed reliance on the reports, never asked the court to review them, conceded they were unsupportive, did not argue they were legally defective, and persisted in this course though given multiple opportunities to abandon it. Thus, Ghilotti and his amici curiae suggest, there was no basis for the court to examine reports which, they say, were extrinsic to the proceeding.

This overstates the facts. When, at the hearing of November 29, 2001, the superior court broached the issue whether the evaluators had followed the correct criteria, the county's attorney did belatedly ask whether the court wished to review the reports, but the court demurred. The court later granted a continuance, but only to allow the *Department unilaterally* to reject the current evaluators' reports as incompetent, and to seek new evaluations.[11]

In any event, it seems clear that both the court and the parties were understandably uncertain how to proceed in the unusual procedural situation presented by the case. On the one hand, the evaluators designated by the Director had recommended *against* Ghilotti's recommitment. The SVPA provides no direct hint that the legal validity of such recommendations is subject to judicial review, and no prior decision has addressed that issue. Thus, as of November 2001, it was entirely plausible for both the parties and the court to conclude, as they apparently did, that review of evaluators' recommendations for legal error was outside the judicial province.

---

[10]We have indicated that in *future* cases, where the issue is properly presented, the trial court should review a designated evaluator's report to determine whether, *on its face*, the report *is* infected with material legal error. If such legal error *does not appear* on the *face* of the report, the court must accept the report as valid.

Here, however, the designated evaluators had no prior guidance as to the correct statutory criteria; in particular, they were necessarily unaware of the construction we hereafter place on the phrase "*likely* to engage in acts of sexual violence *without appropriate treatment and custody*." (§ 6601, subd. (d), italics added; see text discussion, *post.*) Thus, the normal presumption *against* legal error does not apply. Accordingly, in this case, the trial court should order a designated evaluator's report to be corrected or redone pursuant to correct legal standards unless, upon review of the current reports, the court finds the report makes expressly clear that correct legal standards *were* applied.

[11]We note that, prior to the filing of the 2001 recommitment petition, the Department apparently *did* unilaterally reject the report of one evaluator, Dr. Maram, as insufficient, then solicited and received the report of a third evaluator, Dr. Arnold. The basis for the Department's rejection of Dr. Maram's report is unknown, and we express no view on the circumstances under which the *Department* may, under subdivision (d) of section 6601, obtain the evaluations of *more than two* evaluators after unilaterally concluding that one or more of the reports originally obtained was legally insufficient.

On the other hand, both the Director and the superior court questioned whether the evaluators in fact had applied the statute in a legally correct manner—as the court phrased it, whether their conclusions were legally "incompetent"—and whether legal error had affected the evaluators' conclusions that Ghilotti does not meet the statutory criteria for continued confinement, supervision, and treatment. In these circumstances, and given the important public safety interests at stake, we cannot conclude that the issue was waived.

Under the extraordinary circumstances, we conclude, we must vacate the Court of Appeal's order denying mandamus. We will direct the Court of Appeal to issue a writ of mandamus vacating the superior court's order dismissing the 2001 recommitment petition, and to remand the matter to the trial court with directions (1) to review the reports of the designated evaluators for material legal error, and (2) thereafter to proceed under the principles expressed in this opinion. Before entering our dispositional order, however, we address an additional issue pertinent to the further proceedings we contemplate.

3. *What is the meaning of the phrase upon which the evaluators are to opine, i.e., whether "the person has a diagnosed mental disorder so that he or she is <u>likely</u> to engage in acts of sexual violence <u>without appropriate treatment and custody</u>" (§ 6601, subd. (d), emphasis added)?*

In earlier parts of this opinion, we have concluded (1) that a petition to commit or recommit a person under the SVPA cannot be filed without the concurrence of two evaluators, as provided in subdivisions (d) through (f) of section 6601, that the person meets the statutory criteria for commitment, as set forth in subdivision (d) of section 6601; (2) that an evaluator's recommendation for or against commitment or recommitment is invalid if infected by material legal error; and (3) that evaluators' reports are subject to judicial review for such material legal error at the time a petition is submitted for filing. To guard against such error, and to provide guidance on remand in the instant case, we address the meaning of the statutory standard that governs the evaluators' opinions, i.e., whether "the person has a diagnosed mental disorder so that he or she is *likely* to engage in acts of sexual violence *without appropriate treatment and custody.*" (§ 6601, subd. (d), italics added.)

Ghilotti and his amici curiae contend that "likely," as used in this context, means "highly likely," or at least "more likely than not." They also suggest that if the evaluators think the person is more likely than not to reoffend *without* appropriate continuing treatment, but does not present that level of

risk *with* such treatment, the evaluators must reduce their overall risk assessment to the extent they believe the person is likely to pursue such treatment *voluntarily* after his or her *unconditional* release.

The People, on the other hand, urge that "likely," as statutorily applied to a person's risk of violent sexual reoffense, does not mean "probable" or "more likely than not," but refers to "a significant chance, not minimal; something less than 'more likely than not' and more than merely 'possible.'" Moreover, the People assert, because the standard set forth in section 6601, subdivision (d), requires the evaluators to predict whether the person is likely to reoffend "without appropriate *treatment and custody*" (italics added), the evaluators must assume, as the trial court suggested, that the person will not be subject to custody or supervision and will not be receiving appropriate treatment.

We conclude that neither the People, nor Ghilotti and his amici curiae, are entirely correct. We agree with the People that "*likely* to engage in acts of sexual violence" (italics added), as used in section 6601, subdivision (d), does not mean the risk of reoffense must be higher than 50 percent. Instead, the phrase requires a determination that, as the result of a current mental disorder which predisposes the person to commit violent sex offenses, he or she presents a *substantial danger*—that is, a *serious and well-founded risk*—of reoffending in this way if free. If an evaluator finds such a serious and well-founded risk, but nonetheless recommends against commitment or recommitment solely because the evaluator cannot conclude the person is *more likely than not* to reoffend, the evaluator has applied the statute erroneously.

On the other hand, we agree with Ghilotti and his amici curiae that the phrase "without appropriate treatment and custody" does not preclude the evaluators from concluding, with all due prudence, that the person's amenability to effective voluntary treatment reduces below this serious level his potential danger of reoffense if free, and that the person therefore does not meet the criteria for commitment to the Department's custody. We explain our reasoning in detail.

█ We first examine the language of the statute, and, in particular, the phrase "likely to engage in acts of sexual violence" (§ 6601, subd. (d)). Ghilotti urges at the outset that the most commonly understood meaning of "likely" is "having a better chance of occurring than not." While the word is often defined in these terms (see, e.g., 8 Oxford English Dict. (2d ed. 1989) p. 949, col. 1; Webster's 3d New Internat. Dict. (1965) p. 1310, col. 3), modern legal references in particular suggest that "likely" may be used flexibly to cover a range of expectability from possible to probable.

For example, a legal dictionary states that while "likely . . . [m]ost often . . . indicates a degree of probability greater than five on a scale of one to ten . . . it may also refer to a degree of possibility that is less than five on that same scale." (Garner, A Dict. of Modern Legal Usage (2d ed. 1995) p. 530, col. 1.) This same source refers the reader to the definition of "probable" (*ibid.*), there explaining that the words "probable," "likely," and "possible" represent, in order of *decreasing strength,* gradations of the relative chance that something might happen, such that "likely" "is 'a strong *possible*" but a weak *probable.*" ' [Citation.]" (*Id.,* p. 693, col. 2 to p. 694, col. 1, italics in original.)

One legal thesaurus includes, as synonyms for "likelihood," the following: "chance," "conceivability," "fair chance," "fair prospect," "plausibility," "possibility," "potential," "reasonable chance," and "well-grounded possibility." (Burton, Legal Thesaurus (2d ed. 1992) p. 320, col. 2.) Another legal dictionary/thesaurus indicates a parallel range of meaning, citing "inclined," "conceivable," and "possible" among the synonyms for "likely." (Stratsky, West's Legal Thesaurus/Dict. (Special Deluxe Ed. 1986) p. 459.)

Legal usage in the United Kingdom reflects similar flexibility, depending on the context in which the word is used. A prominent British reference suggests that " '[l]ikely' may have a range of definitions from possible to probable . . . ." (2 Greenberg & Millbrook, Stroud's Judicial Dict. of Words and Phrases (6th ed. 2000) p. 1476, col. 2.)

California decisions indicate a varied contextual understanding of the word "likely." In *People v. Sargent* (1999) 19 Cal.4th 1206 [81 Cal.Rptr.2d 835, 970 P.2d 409], we said in passing that the felony child endangerment statute, which punishes a caretaker's willful abuse or neglect of a child under " ' "circumstances . . . likely to produce great bodily harm or death" ' " (Pen. Code, § 273a, subd. (a)) is " 'intended to protect a child from an abusive situation in which the probability of serious injury is great.' " (*Sargent, supra,* 19 Cal.4th at p. 1216, quoting *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771].) But *People v. Hansen* (1997) 59 Cal.App.4th 473 [68 Cal.Rptr.2d 897] indicated this statute is satisfied when the child is placed in a situation where a serious health hazard or physical danger is "reasonably foreseeable" (*id.,* at p. 479), as where the caretaker stores a loaded gun in a home occupied by children without denying the children access to the weapon (*id.,* at p. 480).

In *People v. Savedra* (1993) 15 Cal.App.4th 738 [19 Cal.Rptr.2d 115], the defendant was charged with possessing a deadly weapon in jail (Pen. Code, § 4574, subd. (a)), i.e., a rusty nail with a handle made of toilet paper. The

trial court instructed, under *People v. Rodriquez* (1975) 50 Cal.App.3d 389, 396 [123 Cal.Rptr. 185], that a deadly weapon for this purpose is any instrument or object *likely* to produce death or great bodily injury. The jury asked whether "likely" meant " 'more probable than not' " or " 'merely possible' "; the court answered that "likely" referred to the " '*potential* for use as a deadly weapon.' " (*Savedra, supra,* at p. 744, italics added.) The Court of Appeal found no error. It noted that, although "likely" most often means "more likely than not," the word has a broader meaning in connection with a statute seeking to protect inmates and jail personnel from armed attack. (*Id.,* at pp. 744-745.)

We ourselves consistently have given a similar flexible interpretation to the statute requiring a change of venue in any criminal case where there is a "reasonabl[e] likel[ihood]" the defendant cannot otherwise receive a fair trial. (Pen. Code, § 1033, subd. (a).) As we have indicated, "[i]n this context, 'reasonably likely' ' "means something less than 'more probable than not' " and "something more than merely 'possible.' " [Citation.]' " (*People v. Dennis* (1998) 17 Cal.4th 468, 523 [71 Cal.Rptr.2d 680, 950 P.2d 1035], quoting *People v. Proctor* (1992) 4 Cal.4th 499, 523 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

Courts have also relied heavily on context to interpret and apply such closely related words and phrases as "probability," "reasonable probability" and "substantial probability." (See, e.g., *Strickland v. Washington* (1984) 466 U.S. 668, 693-694 [104 S.Ct. 2052, 2067-2068, 80 L.Ed.2d 674] ["reasonable probability," for purposes of determining whether ineffective assistance of counsel affected the trial outcome, does not mean "more likely than not," but merely a "probability sufficient to undermine confidence in the outcome"]; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894] [Code Civ. Proc., § 425.13, subd. (a), which forecloses punitive damage claim in a medical malpractice action unless, prior to trial, the plaintiff demonstrates a " 'substantial probability' " that the claim " 'will prevail,' " requires the plaintiff only to demonstrate a triable issue, not that he is more likely than not to prevail before the fact finder]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243] ["probability" for purposes of determining whether state law error affected the trial outcome does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility].)

We further note that when the Legislature wishes to employ a "more likely than not" standard, it has demonstrated its ability to do so in express terms. (E.g., *Bus. & Prof. Code,* § 6180.8 [superior court may assume interim control of ceased law practice where it appears "more likely than not" that

application for assumption of control will be granted]; Civ. Code, §§ 1861.1, subd. (d), 1861.6, subd. (b)(4) [innkeeper may obtain writ of possession of nonpaying guest's luggage where it is "more likely than not" innkeeper's suit for money owed will prevail]; Code Civ. Proc., §§ 405.3, 405.32 [court shall expunge notice of lis pendens unless claimant establishes it is "more likely than not" he will prevail on his claim against real property]; Code Civ. Proc., §§ 481.190, 484.090, subd. (a) [attachment order will issue where claimant proves it is "more likely than not" his claim will prevail]; *id.*, §§ 511.090, 513.010, subd. (b) [applicant for writ of possession under claim and delivery law may obtain temporary restraining order against defendant's transfer of property by showing it is "more likely than not" the claim of right to possession will prevail]; Pen. Code, § 187, subd. (b)(2) [crime of fetus murder does not apply to abortion by licensed physician where childbirth would "more likely than not" have resulted in mother's death]; see also, e.g., Civ. Code, § 2225, subd. (e)(3) [under "Son of Sam" law, Attorney General may obtain order compelling deposit of covered proceeds or profits with bank trustee by showing it is "more probable than not" there are beneficiaries entitled to such funds]; Evid. Code, § 646, subd. (c)(2) [where res ipsa loquitur presumption would apply, but defendant has introduced rebuttal evidence, jury must be instructed to decide in defendant's favor unless, from all the evidence, it appears "more probable than not" that defendant's negligence was proximate cause of injury].)

Thus, mere use of the word "likely" is not proof that the Legislature intended to require the evaluators to predict a greater than 50 percent chance the person would reoffend. We must therefore look to the context of the SVPA to determine what the Legislature meant by this term.

We note first the Legislature's uncodified statement of the SVPA's purpose. The Legislature declared the need to confine and treat a "small but extremely dangerous group of sexually violent predators," already incarcerated, who "are not safe to be at large and if released [at the conclusion of their prison terms] represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence." (Stats. 1995, ch. 763, § 1.) Once these persons are found beyond reasonable doubt to be likely to commits acts of sexually violent criminal behavior, said the Legislature, they should "be confined and treated until [but only until] . . . it can be determined that they no longer represent a threat to society." (*Ibid.*) The Legislature stressed that the continuing danger posed by these persons "is a currently diagnosed mental disorder which *predisposes* them to engage in sexually violent criminal behavior." (*Ibid.*, italics added.)

In accord with these aims, the SVPA itself defines an SVP as one previously convicted and sentenced for a sexually violent offense against

two or more victims, "who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a).) A "diagnosed mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that *predisposes* the person to the commission of criminal sexual acts *in a degree constituting the person a menace to the health and safety of others.*" (*Id.*, subd. (c), italics added.) Consistent with this standard of mentally disordered dangerousness, evaluators screening a person to determine whether a SVPA commitment or recommitment petition may be filed are to opine whether the person has a "diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody." (§ 6601, subd. (d).)

■ The SVPA thus consistently emphasizes the themes common to valid civil commitment statutes, i.e., a current *mental condition or disorder* that makes it difficult or impossible to control volitional behavior and *predisposes* the person to inflict harm on himself or others, thus producing *dangerousness* measured by a high risk or threat of further injurious acts if the person is not confined. (*Hubbart, supra,* 19 Cal.4th 1138, 1152-1164 [rejecting substantive due process challenge to California SVPA statute, noting that statute validly requires a mental disorder producing dangerousness]; see *Kansas v. Hendricks* (1997) 521 U.S. 346, 358 [117 S.Ct. 2072, 2080, 138 L.Ed.2d 501] (*Hendricks*) [upholding similar Kansas SVPA].)

■ But "danger to the health and safety of others" (§ 6600, subd. (a); see also Stats. 1995, ch, 763, § 1) produced by a mental disorder that "predisposes" one to the commission of sexual violence (§ 6600, subd. (c)); see also Stats. 1995, ch. 763, § 1) does not, by common understanding, evaporate with an expert's prediction that the sufferer's risk of reoffense is *no greater than 50 percent.* "Danger" is merely "the state of being exposed to harm" (Webster's 3d New Internat. Dict., *supra,* p. 573, col. 2) or "the condition of being exposed to the *chance* of evil; *risk*; peril" (4 Oxford English Dict., *supra,* p. 241, col. 1, italics added), and that one is "predisposed" to do something simply connotes that he or she is "inclined" or "susceptible" to doing it (Webster's 3d New Internat. Dict., *supra,* p. 1786, col. 2).

Of course, in section 6601, subdivision (d), and at other points in the statute, the SVPA defines and quantifies both the mental disorder it requires, and the danger it seeks to forestall, in terms of the likelihood that the person will reoffend. (§§ 6600, subd. (a), 6602, subd. (a), 6602.5, subd. (a), 6605, subds. (c), (d), 6607, subd. (a), 6608, subds. (a), (d).) The requisite likelihood of reoffense is thus a separate determination which does not inevitably

flow from one's history of violent sex offenses and a predisposing mental disorder.[12]

On the other hand, the word "likely," when used in this context, must be given a meaning consistent with the statute's clear overall purpose. That purpose is to protect the public from that limited group of persons who were previously convicted and imprisoned for violent sex offenses, and whose terms of incarceration have ended, but whose current mental disorders so impair their ability to control their violent sexual impulses that they *do in fact* present a high risk of reoffense if they are not treated in a confined setting.

The word "likely," as used in the statute, also must be construed in light of the "difficulties inherent in predicting human behavior" (*Hubbart, supra,* 19 Cal.4th 1138, 1163), particularly in mathematical terms. This is particularly so with respect to the requirements of section 6601, which represents only the *initial screening stage* of the SVPA process. If mental health evaluators appointed under section 6601 cannot concur that the person meets the criteria for commitment or recommitment, judicial proceedings to commit or

---

[12]Justice Moreno suggests that a particularly high "likel[ihood]" of reoffense is necessary in order to distinguish committable offenders from other dangerous recidivists. Both he and Justice Werdegar argue that such a result is also necessary to give separate meaning to the mental-disorder and likely-to-reoffend elements of the SVPA. They observe that the mental-disorder prong requires a mental or emotional condition which makes it at least "serious[ly] difficult[ ]" to control violent sexual impulses (see *Kansas v. Crane* (2002) 534 U.S. 407, 411 [122 S.Ct. 867, 870, 151 L.Ed.2d 856] (*Crane*); *Hendricks, supra,* 521 U.S. 346, 358-360 [117 S.Ct. at pp. 2080-2081]; *Hubbart, supra,* 19 Cal.4th 1138, 1155-1156), and thus itself applies only to persons with an elevated risk of sexual reoffense. Therefore, they reason, the distinct requirement that the person be likely to reoffend must further limit the SVPA to those whose degree of dangerousness is even higher.

We agree that the two elements are distinct, but we view their relationship differently. In the first place, it is a particular form of dangerous *mental disorder,* not a particular *degree* of dangerousness, that "distinguish[es] a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' " (*Crane, supra,* 534 U.S. 407, 411 [122 S.Ct. 867, 870].) A sex offender who *lacks a qualifying mental disorder* cannot be committed *no matter how high his or her risk of reoffense.* (§§ 6600, subd. (a)(1), (c), 6601, subd. (d), 6604; see *Crane, supra,* 534 U.S. at p. 411 [122 S.Ct. at p. 870]; *Hendricks, supra,* 521 U.S. 346, 358-360 [117 S.Ct. 2072, 2080-2081]; *Hubbart, supra,* 19 Cal.4th 1138, 1155-1156; see also fn. 15, *post.*)

On the other hand, the SVPA requires both a qualifying mental disorder *and* a "likel[ihood]" of reoffense, and the one does not predetermine the other. That one's mental disorder causes *serious difficulty* in controlling violent sexual impulses does not mean that such control is *impossible.* (*Crane, supra,* 534 U.S. 407, 411 [122 S.Ct. 867, 870].) Many factors, including amenability to voluntary treatment (see discussion, *post*), may influence the disordered offender's motivation, ability, means, and opportunity to function lawfully without supervision or restraint despite the impairment. The SVPA seeks to identify, confine, and treat only those volitionally impaired sex offenders whose chances of doing so are sufficiently low to present a serious, well-founded risk of reoffense.

recommit the person may not even take place, and the person must be unconditionally released without judicial scrutiny of the danger he or she may represent. On the other hand, if the evaluators do concur, and an SVPA petition is filed, the person is entitled to a full jury trial, and cannot be finally committed unless the jury unanimously finds, beyond a reasonable doubt, that he is an SVP.

We therefore conclude that the phrase "*likely* to engage in acts of sexual violence" (italics added), as used in section 6601, subdivision (d), connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must conclude that the person is "likely" to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community.

This interpretation of "likely," requiring *substantial danger* of new acts of sexual violence arising from the offender's current mental disorder, is consistent with the standards used by the Legislature in other current and past statutes to justify the extended confinement and treatment of convicted offenders who, after their maximum periods of incarceration, remain dangerous as the result of mental diseases, defects, or disorders. (See Pen. Code, §§ 1026.5, subd. (b)(1) [person found not guilty by reason of insanity is subject to extended commitments, beyond maximum period of penal confinement, if "by reason of a mental disease, defect, or disorder[, he or she] represents a *substantial danger* of physical harm to others" (italics added)], 2972, subd. (c) [one imprisoned for forcible or violent crime aggravated by a severe mental disorder is subject to extended commitments, beyond termination of parole, if the disorder is not in remission, cannot be kept in remission without treatment, and causes the person to "represent[ ] a *substantial danger* of physical harm to others" (italics added)]; Welf. & Inst. Code, former § 6316.2, subd. (a)(2) as amended by Stats. 1979, ch. 992, § 2, pp. 3379-3380, and repealed by Stats. 1981, ch. 928, § 2, p. 3485 [one convicted of sex crime, and diverted for treatment under former law governing mentally disordered sex offenders, is subject to extended commitment, beyond maximum period of penal confinement, if as the result of a mental defect, disease, or disorder, he or she "*is predisposed to the commission of*

sexual offenses to such a degree that he [or she] presents a *substantial danger* of bodily harm to others" (italics added)].)[13]

Ghilotti and his amici curiae contend that constitutional principles of substantive due process, as applicable to involuntary civil commitment statutes, require a limitation of such commitments to persons who are "highly likely" to reoffend. As Ghilotti notes, cases in several other jurisdictions, when stating or holding that final commitment under their similarly worded SVPA's requires at least a better than even chance of reoffense, seem to have been influenced by such considerations.[14]

We are not persuaded, however, that a valid involuntary commitment law requires proof that the person is *more likely than not* to reoffend. As we pointed out in *Hubbart*, *supra*, 19 Cal.4th 1138, "[w]hile due process precludes the involuntary commitment of mentally impaired persons who are not in any sense 'dangerous' [citation], the United States Supreme Court has never directly defined the term." (*Id.*, at p. 1161.) Indeed, we indicated, "[c]ivil commitment statutes have long been upheld where dangerousness is expressed in terms of a 'probability,' 'threat,' or similar risk that a person

---

[13]Ghilotti notes the Legislature's expressed purpose to target a "small but *extremely* dangerous group of sexually violent predators" (Stats. 1995, ch. 763, § 1, italics added) and suggests it thus intended the SVPA to apply only to persons who were most highly likely to commit new acts of criminal sexual violence. Justices Werdegar and Moreno echo these concerns. However, the adjective "extremely" is nowhere repeated in the codified SVPA itself, which speaks of persons who, because of prior convictions for violent sex offenses (§ 6600, subd. (a)) and mental disorders that "predispose[ ]" them to future sex crimes, are "a *menace* to the health and safety of others" (*id.*, subd. (c), italics added) and "a *danger* to the health and safety of others in that it is *likely* that [they] will engage in sexually violent criminal behavior" (*id.*, subd. (a), italics added; see also §§ 6601, subd. (d), 6602, subd. (a), 6602.5, 6605, subds. (c), (d), 6607, subd. (a), 6608, subds. (a), (d)). It appears the Legislature considered persons who meet all these criteria to be extremely dangerous.

[14](E.g., *In re Leon G.* (2001) 200 Ariz. 298 [26 P.3d 481, 488-489] ["likely" means "highly probable"]; *Westerheide v. State* (Fla.Dist.Ct.App. 2000) 767 So.2d 637, 652-653 ["likely" means "having a better chance of existing or occurring than not"], review granted Jan. 23, 2001, No. SC00-2124, 786 So.2d 1192 [table]; *Commonwealth v. Reese* (Mass.Super.Ct., Apr. 5, 2001, No. CIV.A 00-0181-B) 2001 WL 359954, *15 ["likely to engage in sexual offenses" means "a substantial likelihood, at least more likely than not, that the respondent will commit a new sexual offense within the immediate future, understood generally to be within the next five years but with a longer time horizon if the anticipated future harm is extremely serious"]; *Matter of Linehan* (Minn. 1996) 557 N.W.2d 171, 180 ["likely" means "highly likely"]; *In re Commitment of W.Z.* (2001) 339 N.J.Super. 549 [773 A.2d 97, 115-116] [suggesting that "clear and convincing" evidentiary standard, combined with requirement of proof person is "likely" to reoffend, assures a finding that the risk of reoffense is greater than 50 percent], review granted July 19, 2001, No. C-1250, 782 A.2d 428 [table]; *State v. Ward* (1999) 130 Ohio App.3d 551 [720 N.E.2d 603, 609] [statute's requirement of clear and convincing evidence that an offender is "likely" to reoffend requires "proof that produces a firm belief or conviction that an offender will more likely than not commit another sex offense in the future"].)

who is presently mentally disturbed will inflict harm upon himself or others in the future if not confined. (*Heller* [*v. Doe*] [(1993)] 509 U.S. 312, 317-318 [113 S.Ct. 2637, 2641-2642, 125 L.Ed.2d 257] [mentally retarded and mentally ill persons who pose ' "a danger or a threat of danger" ' to self or others]; *Allen v. Illinois* (1986) 478 U.S. 364, 366, fn. 1 [106 S.Ct. 2988, 2990, 92 L.Ed.2d 296] [mentally disordered sex offender with ' "criminal propensities to the commission of sex offenses" '] . . . ; *Greenwood* v. *United States* [(1956)] 350 U.S. 366, 368, fn. 3 [76 S.Ct. 410, 412, 100 L.Ed. 412] [mentally incompetent prisoners who ' "will probably endanger the safety" ' of others]; see *Minnesota* v. *Probate Court* (1940) 309 U.S. 270, 273-274 [60 S.Ct. 523, 525-526, 84 L.Ed. 744, 126 A.L.R. 530] [statute providing for commitment of sexual psychopaths is construed to apply to habitual sex offenders who are ' "likely to attack" ' or injure others].)" (*Hubbart, supra,* at p. 1163, fn. 26.)

*Hubbart* further noted, in general, that *Hendricks, supra,* 521 U.S. 346, the United States Supreme Court's then recent decision upholding the Kansas sexually violent predator law, "suggests a willingness on the part of [that] [c]ourt to accord substantial deference to involuntary civil commitment laws challenged under the federal Constitution." (*Hubbart, supra,* 19 Cal.4th 1138, 1153, fn. 20.) Even assuming we would apply strict scrutiny to a due process challenge under the California Constitution (*Hubbart, supra,* 19 Cal.4th at p. 1153, fn. 20; see also *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 171, fn. 8 [167 Cal.Rptr. 854, 616 P.2d 836]; *People v. Saffell* (1979) 25 Cal.3d 223, 228 [157 Cal.Rptr. 897, 599 P.2d 92]; *In re Moye* (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097]), we do not discern that due process limits the involuntary civil commitment of dangerous mentally disordered offenders only to those persons who are more likely than not to reoffend. In our view, the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes (see *Hofferber, supra,* at pp. 171-172; *Moye, supra,* at pp. 462-463; *In re Franklin* (1972) 7 Cal.3d 126, 145-148 [101 Cal.Rptr. 553, 496 P.2d 465]), even if that risk cannot be assessed at greater than 50 percent. The SVPA is narrowly tailored to achieve this compelling purpose. (See *Hubbart, supra,* at p. 1153, fn. 20.) We therefore reject the constitutional contention made by Ghilotti and his amici curiae.[15]

The test set forth in subdivision (d) of section 6601 is further qualified by requiring an assessment whether the person "is likely to engage in acts of

---

[15]Amici curiae point out that in *People v. Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352], addressing a due process challenge to the former law for commitment of mentally disordered sex offenders, we said "[t]he state's interest in avoiding an erroneous

sexual violence *without appropriate treatment and custody*." (Italics added.) As the trial court indicated, the question thus arises whether the evaluators may consider, as a factor reducing the likelihood of reoffense, the chances that a person who is substantially dangerous if untreated will voluntarily accept community treatment to ameliorate the substantial danger.

The People insist that under subdivision (d) of section 6601, treatment is irrelevant to whether the person meets the criteria for commitment or recommitment as an SVP. They assert that this subdivision, like other provisions of the SVPA, requires a determination whether the person has a diagnosed mental disorder which makes him or her likely to reoffend. In the People's view, the statute assumes that if the person *does* harbor such a dangerous disorder, supervised treatment, under the Director's auspices, is required. Thus, the People urge, under subdivision (d) of section 6601, "in

determination in the individual's favor will only be substantial if the authorities can accurately predict that he is *highly likely* to cause serious harm if released." (*Id.*, at p. 325, fn. 15, italics added.) But amici curiae misunderstand the context of this statement. *Burnick* was not addressing the meaning, or the constitutionality, of the statutory provision calling for the commitment of convicted sex offenders whose mentally disordered predisposition to such crimes made them a "*substantial danger* of bodily harm to others." (Former § 6316.2, subd. (a)(2), italics added.) Instead, *Burnick* was concerned only with the *standard of proof* necessary to establish the person's commitability, concluding that the standard must be proof *beyond reasonable doubt*. Of course, the SVPA provides that, in a trial to determine whether a person is an SVP, the proof of that status must be beyond reasonable doubt. (§ 6604.)

In a related vein, Justice Werdegar points out that the phrase "likely to engage in acts of sexual violence," as used for purposes of *preliminary professional evaluations* in section 6601, subdivision (d), is similar to the statutory standard for *final commitment* (see §§ 6600, subd. (a) [definition of an SVP includes requirement that person is "likely [to] engage in sexually violent criminal behavior"], 6604 [person shall be committed if found after trial to be an SVP]). By interpreting section 6601, subdivision (d), to require only a "substantial danger" of reoffense, she urges, we set a similarly "low" threshold for final commitment, and thereby unduly dilute the statute's requirement of commitment only upon proof beyond a reasonable doubt to a unanimous jury (§ 6604). Without deciding whether the word "likely" has a similar meaning in both contexts, we disagree with Justice Werdegar's underlying premise. Contrary to her assumption, it is not incongruous to require a unanimous jury to be convinced beyond reasonable doubt that one (1) previously was convicted of qualifying violent sex crimes, (2) has a mental disorder which seriously impairs volitional control of violent sexual impulses, and (3) as a result of the disorder, presents a serious and well-founded risk of committing new acts of criminal sexual violence.

Finally, Ghilotti suggests that the recent decision in *Crane, supra*, 534 U.S. 407 [122 S.Ct. 867], by holding that the Constitution allows the civil commitment of dangerous criminal recidivists only on the basis of *mental disorders* that *seriously impair* volitional control (*id.*, at p. 411 [122 S.Ct. at p. 870]), has signalled an equally high constitutional standard for the required degree of future dangerousness itself. We disagree, finding the "mental disorder" and "dangerousness" issues distinct. (See text discussion, *ante*; see also fn. 12, *ante*.) Indeed, *Crane* reaffirms that because "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law," "the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules." (*Crane, supra*, 534 U.S. at p. 414 [122 S.Ct. at p. 871].)

order to reach a conclusion *against* commitment, the evaluators must find that the person is safe *in the absence of any treatment and custody.*" (Italics in original.)

The People point to the SVPA's provisions for *conditional*, or supervised, release during a commitment term. As the People observe, an order for such outpatient placement is allowed only when the superior court determines that, in his or her current mental condition, the person is not likely to reoffend if "under supervision and treatment in the community." (§§ 6607, 6608, subd. (d).) The person must then spend at least a year in the outpatient program before the court may evaluate whether the person is then ready for unconditional release in that "it is not likely that he or she will engage in sexually violent criminal behavior." (§ 6608, subd. (d).) Similarly, the People observe, a committed person's required annual mental review (§ 6605, subd. (a)) can lead to early unconditional release only if the court determines the person's condition has so changed "that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior *if discharged*" (*id.*, subd. (c), italics added), and the Director may otherwise seek the person's early *unconditional* release only if persuaded the person "is no longer a sexually violent predator" (*id.*, subd. (f)).

Ghilotti and his amici curiae urge, on the other hand, that "appropriate treatment and custody," as used in section 6601, subdivision (d), simply means that particular form of treatment in the Director's custody that is concomitant to an SVP commitment. Thus, they reason, if the person is safe without such *custodial* treatment, he or she does not require "appropriate treatment *and custody.*" (*Ibid.*, italics added.) They conclude accordingly that even if the evaluators consider the person dangerous without *any* treatment, the evaluators must adjust their assessment of his or her need for *custodial* treatment to the extent they believe he or she can be trusted to pursue the necessary treatment voluntarily upon release.

Ghilotti and his amici curiae have the better argument. The People are incorrect in suggesting that if the person is dangerous without treatment, but safe with treatment, he must necessarily be treated in custody. Section 6601, subdivision (d), does not say the evaluators must find the person committable if he or she is substantially dangerous *without treatment*; instead, they must do so if they find the person substantially dangerous without appropriate "treatment *and custody.*" (Italics added.) Hence, as Ghilotti suggests, the statute appears to contemplate that the need for treatment and the need for custody are not always one and the same.

Thus, *section 6601, subdivision* (d), like the SVPA in general, asks the broader question whether, as the result of a diagnosed mental disorder, the

person presents a *substantial danger* of reoffense if *released without conditions*, or whether instead he is safe only if restrained, supervised, and treated involuntarily under the Director's custody. In deciding this question, the evaluators are to assess the person "in accordance with a standardized assessment protocol, developed and updated by the . . . Department . . . , to determine whether the person is a sexually violent predator as defined in this article." (§ 6601, subd. (c).) This protocol "shall require assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders. Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (*Ibid.*)

Insofar as the protocol calls for assessment of the nature, degree, and severity of the person's mental disorder, it appears to allow consideration whether the disorder, though dangerous if untreated, is of a kind and extent that can be effectively treated in the community, and whether the disorder leaves the person willing and able to pursue such treatment voluntarily. Moreover, section 6601, subdivision (c), says the protocol "shall include" the enumerated risk factors, but does not say the enumerated factors are exclusive. Thus, insofar as the protocol permits, the evaluators may consider any factor which, in their professional judgment, is relevant to the ultimate issue whether the person is a substantial danger to reoffend if free in the community without any conditions, supervision, monitoring, or mandatory treatment in the Director's custody.

Particularly when one, like Ghilotti, has previously been committed as an SVP, and thus has already been subject, while in hospital confinement, to the SVPA's mandated treatment program (§ 6606, subds. (a), (c)), the evaluators may obviously assess his or her progress, if any, as a factor in determining whether he or she represents a substantial danger if unconditionally released at the end of a commitment term. Theoretically this might include an assessment that while a continuing mental disorder makes it dangerously difficult for the person to control his or her violent sexual impulses without continuing treatment, there is practicable treatment, readily available in the community, which would eliminate or control the impulses, and the person's current mental condition is such that he or she can be, and is, willing and able to pursue such treatment as long as it is needed. There appears no statutory reason why the evaluators may not consider these factors as bearing on the overall assessment of the person's risk of reoffending if free of custody.

Were it otherwise, evaluators would have to find the person eligible for indefinite, even permanent, custody so long as he or she remained dangerous

without treatment, even if it was clear the danger both could and would be obviated by voluntary treatment in the community. We do not perceive that to be the intent of section 6601.

Such a conclusion is consistent with the SVPA's other provisions for determining whether a person is, is not, remains, or is no longer an SVP, or whether he or she meets the requirements of *conditional* release *during* a term of commitment. In each instance, the issue is the degree of danger the person presents under the circumstances contemplated, i.e., either conditional release or complete freedom without conditions. (See, e.g., §§ 6605, subds. (c), (d) [after annual mental exam, committed person must be released before expiration of term unless state proves person remains disordered and dangerous "if discharged"], 6608, subds. (a), (d) [person may be conditionally released during commitment term if court finds he or she is not dangerous if placed "under supervision and treatment in the community"].)[16]

Our conclusion also conforms with available authority. Decisions addressing similar schemes for the civil commitment of mentally disordered and dangerous persons have held that the person's amenability to voluntary treatment is a factor in determining whether commitment is necessary. (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1600 [266 Cal.Rptr. 724] [in proceeding for extended commitment of person found not guilty by reason of insanity, defendant may present evidence that medication is effective and he will take medication]; *People v. Williams* (1988) 198 Cal.App.3d 1476, 1482-1483 [244 Cal.Rptr. 429] [in restoration to sanity proceeding for person found not guilty by reason of insanity, trial court erred by instructing that person could not be restored to sanity unless it was shown he needed no medication]; *Conservatorship of Davis* (1981) 124 Cal.App.3d 313, 319-321 [177 Cal.Rptr. 369] [in conversatorship proceeding under Lanterman-Petris-Short Act, jury may be instructed that person is not gravely disabled if he or she understands the need for treatment and has made a meaningful commitment to pursue it].)

---

[16]In general, the SVPA bases the need for confinement on the *danger of reoffense* presented by a convicted violent sex offender's mental disorder if the person is free. However, at one point in its uncodified statement of intent, the Legislature says it intends dangerously disordered violent sex offenders to be confined "only as long as the[ir] *disorders* persist." (Stats. 1995, ch. 763, § 1, italics added.) Viewed in isolation, this phrase might suggest a legislative purpose that, once diagnosed with dangerous disorders, such persons are to be *confined* until the disorders are *cured*, without regard to the availability or effect of noncustodial treatment to control their dangerousness. But in view of the SVPA's overall scheme, which calls for relatively short-term extendable commitments, with constant evaluation whether the person remains a danger either with or without restraints and conditions, we do not so interpret the statute. Indeed, since a constitutionally valid civil commitment statute must require both a mental disorder *and resulting dangerousness* (see fn. 6, *ante*), such a construction might raise constitutional concerns.

■ Of course, given the compelling protective purposes of the SVPA, the evaluators must weigh the possibility of voluntary treatment with requisite care and caution. Common sense suggests that the pertinent factors should include (1) the availability, effectiveness, safety, and practicality of community treatment for the particular disorder the person harbors; (2) whether the person's mental disorder leaves him or her with volitional power to pursue such treatment voluntarily; (3) the intended and collateral effects of such treatment, and the influence of such effects on a reasonable expectation that one would voluntarily pursue it; (4) the person's progress, if any, in any mandatory SVPA treatment program he or she has already undergone; (5) the person's expressed intent, if any, to seek out and submit to any necessary treatment, whatever its effects; and (6) any other indicia bearing on the credibility and sincerity of such an expression of intent.

Finally, we note that nothing in the SVPA *requires* a person, once committed to hospital confinement under that statute, to complete a prescribed program of treatment under the Director's supervision in order to be eligible for outright release. However, it would be reasonable to consider the person's refusal to cooperate in any phase of treatment provided by the Department, particularly a period of supervised outpatient treatment in the community, as a sign that the person is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community.

CONCLUSION

Insofar as the order issued by this court on December 12, 2001, stays Ghilotti's release from a secure mental health facility, the stay is extended pending the superior court's determination, pursuant to the views expressed herein, whether to dismiss the 2001 recommitment petition as legally insufficient, or to go forward with recommitment proceedings under the SVPA. The order of the Court of Appeal, summarily denying the petition for mandamus, is vacated. Good cause appearing, the cause is remanded to the Court of Appeal with directions (1) to issue a writ of mandamus vacating the order of the superior court dismissing the 2001 recommitment petition, and (2) to remand the matter to the trial court with directions (a) to review the designated evaluators' reports for material legal error, as set forth in footnote 10 of this opinion, and (b) thereafter to proceed in accordance with the views set forth in this opinion.

George, C. J., Kennard, J., and Chin, J., concurred.

**WERDEGAR, J.,** Concurring.—I agree with the majority that under California's Sexually Violent Predators Act (SVPA) a petition for commitment

or recommitment must be supported by the evaluations of two mental health professionals, and that the superior court may review the evaluators' reports for material legal error; I therefore concur in the court's disposition. I differ from the majority, however, in its interpretation of the statutory requirement that, in order to confine a violent sexual offender beyond the completion of his or her term of imprisonment, two psychological evaluators (and ultimately a jury) must find that the individual is "likely to engage in acts of sexual violence." (Welf. & Inst. Code, § 6601, subd. (d).)[1] While one clearly may prefer a scheme that confines all or nearly all sexually violent predators (SVP's) beyond completion of their sentences—the effective result of the majority's interpretation, despite its protests to the contrary—that is not the scheme the Legislature chose. Rather, the Legislature, likely mindful of constitutional due process constraints, devised a scheme that extends the confinement of only those SVP's who pose a danger distinct from and greater than the danger inevitably posed by such offenders in general.[2]

As will appear, I believe the Legislature intended "likely" to have its most common, ordinary language meaning of "more likely than not," rather than the weaker, more amorphous meaning of a "substantial," "serious," or "well-founded" risk that the majority discerns. (Maj. opn., *ante*, at pp. 895, 916.) I think the majority's standard is wrong as a matter of statutory interpretation.

First, the majority's standard is contrary to both ordinary and legal usage, in which the most common meaning of "likely" is having a better chance of occurring than not. For example, the first definition in Merriam-Webster's Collegiate Dictionary (10th ed. 2000) at page 673 is "having a high probability of occurring or being true : very probable." An unabridged dictionary defines "likely," first, as "of such a nature or so circumstanced as to make something probable," and, second, as "having a better chance of existing or occurring than not." (Webster's 3d New Internat. Dict. (1965) p. 1310, col. 3.) Black's Law Dictionary (6th ed. 1990) at page 925 defines the term as "probable and having better chance of existing or occurring than not." Even Garner's Dictionary of Modern Legal Usage, upon which the majority relies (maj. opn., *ante*, at p. 917), states that "likely" "[m]ost often" is used to

---

[1] Unless otherwise specified, all further statutory references are to the Welfare and Institutions Code.

[2] I note that since petitioner committed his offenses, the Legislature, through a variety of statutory amendments, has considerably increased the punishment for multiple sex crimes, including sexually violent offenses, so that individuals convicted of such multiple offenses today are subject to imprisonment for life, thus limiting the need in the future to invoke the SVPA. (See, e.g., Pen. Code, §§ 667.6, 667.61.)

mean more probable than not. (Garner, A Dict. of Modern Legal Usage (2d ed. 1995) p. 530, col. 1.)[3]

Moreover, courts in at least six other states have interpreted "likely" in their sexually violent predator laws as meaning *at least* more likely than not; some have interpreted the term as setting a higher standard, such as "highly probable." (Maj. opn., *ante*, at p. 923, fn. 13.) In contrast, the majority cites *no* decision in which "likely," as a predictive standard in a sexually violent predator law, has been construed to mean something *less* than more likely than not. Granted that "likely" *can* refer to lesser degrees of probability, we nonetheless should have good evidence in the statute or its history before holding that the California Legislature, *uniquely*, used the term in other than its ordinary meaning.

The statutory context provides no reason for finding such a departure from ordinary usage. To the contrary, the majority's standard effectively nullifies a key provision of the SVPA.

Section 6600, subdivision (a)(1) defines an SVP, in part, as having a mental disorder such that it is "likely that he or she will engage in sexually violent criminal behavior." At trial of an SVP petition, the jury or court must find whether, beyond a reasonable doubt, the person is an SVP. (§ 6604.) "Likely . . . [to] engage in sexually violent criminal behavior" thus defines one of the elements that must be proven before a person may be committed. Unless "likely" is to mean one thing for the evaluators under section 6601, subdivision (d) and another for the jury under section 6604—a position the majority does not adopt and for which there appears no support in the statute—what we say about the term here will also dictate the jury instructions in future SVP trials.

To find a person is an SVP, the jury, pursuant to the statutory definition, must find that the person (i) has been convicted of violent sexual offenses against two or more victims, and (ii) has a "diagnosed mental disorder," because of which (iii) the person is dangerous in that he or she, as noted, is likely to engage "in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A " '[d]iagnosed mental disorder,' " for this purpose, is a disorder that "predisposes the person to the commission of criminal sexual acts . . . ." (*Id.*, subd. (c).)

---

[3]The majority also relies on two legal *thesauruses*. (Maj. opn., *ante*, at p. 917.) But a thesaurus is designed to aid writers by giving a wide range of related words and phrases, rather than to define words by listing only exact synonyms. Indeed, the introduction to one of the references the majority relies on warns that "[s]ince a wide range of words is provided, some of which are not exact synonyms, the user should consult a legal dictionary to determine precise meanings . . . ." (Burton, Legal Thesaurus (2d ed. 1992) p. vii.) One should look to a dictionary, rather than a thesaurus, for a definitive statement of a word's meaning.

The majority defines the final part of this three-part standard as presenting "a *substantial danger*—that is, a *serious and well-founded risk*" of reoffending. (Maj. opn., *ante*, at pp. 895, 916.) It appears, however, that such a risk would virtually *always* be present when the first two parts of section 6600's test were met. A person who has been convicted of multiple violent sex crimes and who continues to suffer from the mental disorder that led to those crimes, and that predisposes him or her to future sex crimes, would, it seems, *always* present a "substantial," "serious" or "well-founded" risk of reoffending. The majority's definition thus renders superfluous one of the three statutory criteria for confinement as an SVP. Contrary to legislative intent, therefore, the effect is likely to be that *any* prisoner with the requisite priors and a continuing mental disorder will be subject to commitment beyond his or her term of imprisonment, and *any* current SVP confinee who has not been cured of his or her disorder will be subject to recommitment. Whatever the appeal of such a scheme, it is *not* the one the Legislature enacted.

In other respects, as well, the majority's interpretation appears contrary to the legislative intent. In sections 6603, subdivision (f) and 6604, the Legislature required that the facts necessary for confinement be proven by the highest evidentiary standard, *beyond a reasonable doubt*, and that the jury, if one is requested, be unanimous. The law thus manifests a clear intent that the state exercise maximum caution before depriving persons of their liberty on the basis of potential *future* crimes. While it may be theoretically possible to ask a jury whether, beyond a reasonable doubt, there is a "substantial danger" of reoffense, the use of such a low-risk threshold threatens to vitiate the effect of the high evidentiary standard and unanimity requirement. Because the low "substantial danger" standard will virtually *always* be met, the requirement of proof beyond a reasonable doubt fades radically in significance. If the person has committed prior violent sex crimes and continues to suffer from a mental disorder predisposing him or her to further sex crimes, a "substantial danger" is proven beyond *any* doubt.

The Legislature's emphasis on caution in confining persons because of their possible future crimes is also apparent from the uncodified statement of purpose that accompanied the SVPA's enactment, in which the Legislature stated its intent to pick out for confinement "a small but extremely dangerous group of sexually violent predators" who are found, beyond a reasonable doubt, "likely" to reoffend. (Stats. 1995, ch. 763, § 1.) The vague, and relatively low, risk threshold adopted by the majority undermines that intent by allowing confinement of those who pose a "substantial" danger, whether or not they are extremely dangerous or, in the ordinary sense of the word, "likely" to reoffend. Rather than a small group of the most dangerous sex offenders, the majority's interpretation permits extended confinement of *any*

prisoner with the requisite prior offenses who has not been cured of his or her paraphilia or pedophilia. The Legislature has, in other statutes, mandated life sentences for certain repeat violent sex offenders (see Pen. Code, § 667.61, subds. (a), (d)(1)), but such sentences cannot, of course, be imposed ex post facto or without the other protections of the criminal law. The drafters of the SVPA knew that and thus narrowly tailored the law to those who were extremely dangerous, not merely by virtue of their past offenses, but because, in their present state, they were actually likely to reoffend.

Such caution in making civil commitments for public protection is, to some extent, constitutionally mandated. (See *Addington v. Texas* (1979) 441 U.S. 418, 427 [99 S.Ct. 1804, 1810, 60 L.Ed.2d 323]; *Matter of Linehan* (Minn. 1996) 557 N.W.2d 171, 180.) Allowing commitment on evidence of too low a level of danger implicates the high court's due process concern in *Addington v. Texas*—the risk that triers of fact will erroneously predict that individuals would act harmfully in the future if not confined. The majority's "substantial danger" standard, which is met by virtually *all violent offenders with a sexual disorder*, verges on the constitutional limit. The Legislature, by requiring, among other things, proof beyond a reasonable doubt that the person is actually likely to reoffend, in the ordinary sense of the term "likely," narrowly tailored our SVPA to avoid issues of constitutionality. Unfortunately, the standard articulated by the majority today, one lower than that set forth in the statute, puts the SVPA at renewed constitutional hazard.

Although I concur in ordering issuance of the writ of mandamus, therefore, I would construe section 6601, subdivision (d), consistent with the legislative intent, as requiring a determination that the person is more likely than not to reoffend if not confined and treated.

**MORENO, J.,** Concurring and Dissenting.—I agree with the majority that a petition seeking the commitment or recommitment of a person under the Sexually Violent Predators Act (the Act) (Welf. & Inst. Code, § 6600 et seq.)[1] cannot be filed unless two mental health professionals designated by the Director of the State Department of Mental Health (the Director) "concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody." (§ 6601, subd. (d).) Contrary to the argument advanced by the Attorney General, the Director is not empowered under subdivision (h) of section 6601 to seek a petition for commitment or recommitment if the designated evaluators conclude that the person does not meet the statutory criteria.

---

[1]All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

I write separately because I do not join in part B.2 of the majority opinion, which addresses "whether a court entertaining a petition for an involuntary civil commitment has authority to review for legal error the expert evaluations which are a prerequisite to the filing of such a petition." (Maj. opn. *ante*, at p. 910.) In my view, this issue is not raised by the circumstances of the present case, because neither the Director nor the district attorney sought such judicial review.

Regarding part B.3 of the majority opinion, which discusses the meaning of the statutory phrase "likely to engage in acts of sexual violence" (§ 6601, subd. (d)), I agree with the majority that the statutory standard that the person is "likely to engage in acts of sexual violence" does not mean that it must be more likely than not that the subject will engage in such acts. I write separately to explain my understanding of the majority's holding that the word "likely" means "presents a *substantial danger*—that is, a *serious and well-founded risk*—of reoffending." (Maj. opn., *ante*, at p. 916.)

*Judicial Review of Evaluations*

Three psychologists designated by the Director to evaluate Patrick Ghilotti concluded that, following nearly four years of treatment at Atascadero State Hospital, he no longer is a sexually violent predator (SVP) as defined in the Act. Despite these negative evaluations, the district attorney, at the request of the Director, filed a petition seeking Ghilotti's recommitment as an SVP. The negative evaluations were not attached to the petition. Instead, the petition was supported by declarations of the Director, staff psychiatrists at Atascadero State Hospital, and the Chief Counsel of the State Department of Mental Health. In his declaration and in a letter to the district attorney, the Director stated that he disagreed with the conclusions of the designated evaluators that Ghilotti was not an SVP. In the opinion of the Director, Ghilotti was an SVP because he was likely to reoffend if released without supervision.

The petition notes that the designated evaluators had concluded Ghilotti was not an SVP and that the Director had rejected one of these evaluations as "not meeting the necessary criteria" and ordered a third evaluation. The petition did not allege that the remaining negative evaluation was improperly prepared or otherwise deficient, and the district attorney did not wait for the third evaluation to be completed before seeking recommitment. Rather, the petition alleged that the evaluations were unnecessary because the Director is empowered under subdivision (h) of section 6601 to seek a petition for recommitment even if the designated evaluators conclude that the person does not meet the statutory criteria.

At the hearing on the recommitment petition, the deputy district attorney stated that the government was proceeding "on a somewhat unusual basis" of asserting the Director had the authority under section 6601, subdivision (h), to seek a petition in the absence of evaluators' reports. The deputy district attorney stated that copies of the negative evaluations had been given to Ghilotti's counsel, but had not been given to the court, adding: "We have those available." Ghilotti's counsel observed that *Peters v. Superior Court* (2000) 79 Cal.App.4th 845 [94 Cal.Rptr.2d 350] held that the State Department of Mental Health (the Department) cannot disregard an evaluator's report, and the court replied: "Well, that may be so in the circumstances of that case, but does it apply to circumstances in which the Department simply finds the report to be incompetent?" Ghilotti's counsel agreed that if "an examiner turned out to be a total fraud" the Department could disregard the evaluation, but argued "that's not the facts before this court."

The court then noted that it had not seen the evaluations, but had "some suspicion that the evaluations might be incompetent" because "these evaluators may well be assuming some level of treatment or support network after release that would be entirely subject to Mr. Ghilotti's own choice and election once he's released." Ghilotti's counsel responded that all three evaluations agreed that Ghilotti was not an SVP. The court asked whether the evaluators "give reasoning in the evaluations" and whether "they recite the criteria that they used in evaluating" Ghilotti.

At this point, the deputy district attorney interjected: "Do you think it would be helpful to you to have those evaluations to review?" The court responded: "No, because I don't think that is really my province. What I am concerned about is whether the Department of Mental Health knows what the criteria are, has properly informed the people who are responsible for making the evaluations and whether they have done it appropriately." In response to the court's questions, counsel for the Department confirmed that the Department trains the evaluators and gives them "a protocol handbook." Counsel acknowledged that "regrettably sometimes the evaluations don't comport with that protocol. If it fails to comport, then under those circumstances, as the Court suggested, we would not accept that as an evaluation." The court asked whether the protocol addressed the concerns the court had expressed and counsel responded he "had to plead ignorance."

After restating his concerns about whether the evaluators applied the correct standards, the court acknowledged that it was pursuing an issue "that really isn't before me" and added: "If I had a strong declaration from the Department of Mental Health here today indicating that they have made a good faith effort to do the evaluation and in fact had carefully scrutinized the evaluations they had and determined them to be incompetent and were

setting about finding appropriate evaluations based upon correct criteria, I would be a little more comfortable about the possibility of starting the process in motion and perhaps even contemplating the detention of Mr. Ghilotti further; but based upon the record I have here right now, as [Ghilotti's counsel] amply points out, I don't think that's within my power."

The court, however, invited the Department to take further action: "If you want to go back and talk to your people and get back to me some time tomorrow with a better explanation of what is going on than I have now, I will give you time." The court rejected the Department's argument that the Director had the authority under section 6601, subdivision (h), to seek a petition without the concurrence of two designated evaluators, but observed that "the Director has not only the discretion, but the responsibility to review the evaluations and make sure that they are competent . . . ."

The following day, counsel for the Department did not appear and the deputy district attorney informed the court he "had not received any additional materials and ha[d] no other legal authority to propose to the Court . . . ." The court dismissed the petition.

I find no basis for faulting the superior court. The superior court correctly rejected the government's sole argument in support of the petition that section 6601, subdivision (h), authorized the Director to seek a petition without the concurrence of two designated evaluators. Neither the district attorney nor the Department ever asked the court to review the negative evaluations or asserted that those evaluations were incompetent or deficient in any respect. Even after the court invited the Department to review the evaluations and recessed for the evening, the Department did not ask the court to review the evaluations and did not assert that the evaluations were incompetent or deficient.

Accordingly, I see no basis for vacating the Court of Appeal's order denying mandamus. The issuance of a writ of mandate to compel a judicial act is appropriate only if the lower court has erred. (*Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666] ["The trial court is under a legal duty to apply the proper law and may be directed to perform that duty by writ of mandate"]; 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 99, p. 890 [" 'abuse of discretion' means only that the decision is wrong in law"].) The superior court in the present case did not err.

Because the superior court never was asked to review the negative evaluations, this case is a poor vehicle for deciding whether the court has the authority to do so. I prefer to await a case that involves a request for judicial review of a negative evaluation before addressing this issue.

*Meaning of "Likely to Engage in Acts of Sexual Violence"*

Under section 6601, subdivision (d), the Director shall request a petition for commitment or recommitment as an SVP if two designated evaluators "concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody." The majority properly rejects Ghilotti's contention that the term "likely" as used in this statute means "highly likely," or at least "more likely than not." I agree that the statutory phrase "likely to engage in acts of sexual violence" "does not mean the risk of reoffense must be higher than 50 percent." (Maj. opn., *ante*, at p. 916.) Rather, it is sufficient if the SVP "presents a *substantial danger*—that is, a *serious and well-founded risk*—of reoffending" (*ibid.*) or, in other words, presents "a high risk of reoffense." (*Id.* at p. 921.) The risk of reoffense must be sufficiently high, however, to distinguish SVP's from the general population of convicted sex offenders.

In *Kansas v. Hendricks* (1997) 521 U.S. 346 [117 S.Ct. 2072, 138 L.Ed.2d 501], the high court considered a Kansas SVP statute that required a showing that the person was " 'likely to engage in . . . predatory acts of sexual violence' " and stated: "The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." (*Id.* at p. 357 [117 S.Ct. at p. 2080].)

The high court recently returned to the Kansas SVP statute in *Kansas v. Crane* (2002) 534 U.S. 407 [122 S.Ct. 867, 151 L.Ed.2d 856] to examine the requirement established in *Hendricks* that the person be unable to control his behavior, stating: "*Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' " (*Id.* at p. 411 [122 S.Ct. at p. 870.) One requirement that helps make that distinction, the court noted, was that the person must manifest "a special and serious lack of ability to control behavior." (*Ibid.*) Although " 'inability to control behavior' will not be demonstrable with mathematical precision," the court required "that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." (*Ibid.*)

Sadly, there is a risk that any convicted sex offender will reoffend upon being released from prison. (U.S. Dept. Justice, Bur. J. Statistics, Sex

Offenses and Offenders (Feb. 6, 1997) p. 26 <http://www.ojp.usdoj.gov/bjs/ abstract/soo.htm> [as of Apr. 25, 2002].) The Act, therefore, requires not just a risk of reoffense, but a high risk of reoffense.

Thus, I embrace the majority's "serious and well-founded risk" standard with the understanding that it requires a heightened risk sufficient to "distinguish the dangerous sexual offender" subject to civil commitment "from the dangerous but typical recidivist." (*Kansas v. Crane*, *supra*, 534 U.S. at p. 411 [122 S.Ct. at p. 870].) The risk of reoffense must be sufficiently high to distinguish the "small but extremely dangerous group of sexually violent predators," at which the Act is aimed (Stats. 1995, ch. 763, § 1) from the general population of convicted violent sex offenders, all of whom pose an elevated risk of recidivism.

I also agree with the majority that, in assessing whether a person is likely to reoffend, the evaluators may consider whether the person will voluntarily accept community treatment. (Maj. opn., *ante*, at pp. 924-929.) I note, however, that whether the person's refusal to cooperate in any phase of treatment, such as a period of supervised outpatient treatment in the community, indicates that the person "is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community" (*id.* at p. 929) will depend upon the totality of the circumstances. It may be, for example, that the person declined the conditional release program because it imposed onerous conditions to which the person reasonably objected, or that the person's expected release date was imminent, making conditional release unattractive.

*Conclusion*

I would affirm the order of the Court of Appeal denying the petition for writ of mandamus.

Brown, J., concurred.